**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

LeadingAge Minnesota and Care Providers of Minnesota,

Plaintiffs,

v.

Nicole Blissenbach, *in her official capacity as Commissioner of the Minnesota Department of Labor and Industry*,

Defendant.

Case No. 24-cv-4282 (LMP/JFD)

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION, OR IN THE ALTERNATIVE, A TEMPORARY RESTRAINING ORDER**

---

Plaintiffs LeadingAge Minnesota and Care Providers of Minnesota (together, "Plaintiffs") seek a preliminary injunction, or in the alternative, a temporary restraining order to prevent the enforcement of the Expedited Permanent Modifying Certification Criteria, Notice Posting Requirements, and Holiday Pay Rules for Nursing Home Workers, Minnesota Rules, Part 5200.2000 to 5200.2050 (the "Holiday Pay Rule") promulgated by the recently created "Minnesota Nursing Home Workforce Standards Board" ("NHWSB"). The Holiday Pay Rule was adopted by Defendant on December 9, 2024, and the Rule went into effect on January 1, 2025.

The Holiday Pay Rule is preempted by the National Labor Relations Act ("NLRA") because it authorizes activity prohibited by the NLRA (or at least arguably prohibited by the NLRA) and because it regulates conduct that Congress intended to leave unregulated. As demonstrated below, Plaintiffs are entitled to this relief because they have no adequate

remedy at law and will be irreparably harmed by the Holiday Pay Rule. Moreover, respect for federal law and the public interest strongly weigh in favor of granting a temporary restraining order to maintain the status quo until this Court can fully address the merits of the case.

## FACTUAL BACKGROUND

### A. The Plaintiffs

Plaintiff LeadingAge Minnesota is a non-profit corporation organized under Minnesota law and headquartered in Minnesota. (Compl., Dkt. 1, ¶ 5.) LeadingAge Minnesota is an association of over 1,000 member organizations across Minnesota, representing organizations providing services along the full spectrum of post-acute care and long-term services and support, including what are commonly referred to as "nursing homes." (Id.)

Plaintiff Care Providers of Minnesota is a non-profit corporation organized under Minnesota law and headquartered in Minnesota. (Id. ¶ 6.) Care Providers of Minnesota is an association of over 1,000 member organizations across Minnesota, representing organizations providing services along the full spectrum of post-acute care and long-term services and support, including what are commonly referred to as "nursing homes." (Id.)

### B. The Holiday Pay Rule

On August 24, 2024, the NHWSB published the Proposed Expedited Permanent Modifying Certification Criteria, Notice Posting Requirements, and Holiday Pay Rules for Nursing Home Workers, Minnesota Rules, Part 5200.2000 to 5200.2050. 49 Minn. State Reg. 191-97 (Aug. 26, 2024).

One provision of the Holiday Pay Rule – Minn. Admin. R. 5200.2010 – mandates that nursing home employers pay covered nursing home workers one-and-one-half of their regular hourly wage for all hours worked on one of 11 state holidays. The Holiday Pay Rule also permits employers to negotiate with their workers (or their workers' union) to adjust up to four of the 11 holidays to different dates that are not recognized as state holidays (e.g., the day after Thanksgiving, Christmas Eve, Easter, etc.). The Holiday Pay Rule provides in relevant part:

> **5200.2000 DEFINITIONS.**
>
> . . .
>
> **Subp. 4. Holiday.** "Holiday" means the following dates: New Year's Day, January 1; Martin Luther King's Birthday, the third Monday in January; Washington's and Lincoln's Birthday, the third Monday in February; Memorial Day, the last Monday in May; Juneteenth, June 19; Independence Day, July 4; Labor Day, the first Monday in September; Indigenous Peoples' Day, the second Monday in October; Veterans Day, November 11; Thanksgiving Day, the fourth Thursday in November; and Christmas Day, December 25. A holiday is a 24-hour period comprised of the time from midnight of the date designated as a holiday to the next midnight.
>
> . . .
>
> **5200.2010 HOLIDAY PAY.**
>
> **Subpart 1. Holiday pay.** Beginning January 1, 2025, a nursing home worker who works any holiday shall be paid a minimum of time-and-one-half their regular hourly wage for all hours worked during the holiday.
>
> **Subp. 2. Modification of holiday date and time.**
>
> A. The start and stop times for the 24-hour period comprising a holiday can be modified by a nursing home employer if agreed upon by a majority of affected nursing home workers or the exclusive representative of the affected nursing home workers if one exists.



4375080.v1

> B. A nursing home employer may substitute up to four holidays for an alternate day in the same calendar year if the substitution is agreed upon by a majority of affected nursing home workers or the exclusive representative of the affected nursing home workers if one exists.
>
> C. Any agreement to modify a holiday date or time must be made in the calendar year preceding the start of the calendar year in which the modified holiday is observed. There must be written record of an agreement under this item.
>
> D. The nursing home employer must retain a record of agreement to modify a holiday date or time under item C for a minimum of three years following the observation of the modified holiday.

49 Minn. State Reg. 193 (Aug. 26, 2024) (to be codified at Minn. R. Admin. 5200.2010).

The Holiday Pay Rule mandates time-and-one-half "holiday pay" for specific categories of workers for specific employers in a specific industry. That is, the Holiday Pay Rule seeks to mandate such "holiday pay" for certain "nursing home workers" of "nursing home employers" starting on January 1, 2025. The Holiday Pay Rule also seeks to provide methods for the modification of the holiday pay mandate if "agreed upon by a majority of affected nursing home workers." Minn. R. Admin. 5200.2010, subp. 2.

The Holiday Pay Rule was scheduled to be adopted by Defendant on Monday, November 18, 2024. However, it was not until December 9, 2024, that the Holiday Pay Rule was adopted by Defendant in the Minnesota State Register. 49 Minn. State Reg. 628 (Dec. 9, 2024) ("The rules proposed and published at State Register, Volume 49, Number 9, pages 191-197, August 26, 2024 (49 SR 191), are adopted as proposed."). The Holiday Pay Rule took effect on January 1, 2025.

**C. Defendant's Enforcement Authority**

Defendant Commissioner of the Minnesota Department of Labor and Industry is responsible for enforcing rules promulgated by the NHWSB. Minn. Stat. § 177.27, subd. 4 ("The commissioner may issue an order requiring an employer to comply with . . . any rule promulgated under section . . . 181.213, or 181.215."). Defendant is also authorized to "bring an action in the district court . . . to enforce or require compliance with orders . . . ." Id., subd. 5. If an employer is found to have violated a rule promulgated by the NHWSB, Defendant can seek "back pay, gratuities, and compensatory damages" as well as "an additional civil penalty of up to $10,000 for each violation for each employee." Id., subd. 7.

**D. Impact of the Holiday Pay Rule on Plaintiffs and Plaintiffs' Members**

The Holiday Pay Rule significantly impacts Plaintiffs and Plaintiffs' members. (See, generally, Decl. of Angela Brown, Decl. of Roxanne Hejhal, and Decl. of Annette Greely.)[1] For Plaintiffs' members, the impact is not only financial but it also includes the creation of previously non-existent distinctions between classes of workers depending on the location of their work, expressly authorizing Plaintiffs' members to engage in unlawful collective bargaining with their employees, providing unions with significant bargaining power mid-contract, and creating compliance and legal risks for Plaintiffs' members by failing to define key terms. (Id.) Plaintiffs attempted to assist their members with

[1] The Declarations of Angela Brown, Roxanne Hejhal, and Annette Greely are attached as Exhibits 1 to 3 to the Declaration of Grant T. Collins.

complying with the Holiday Pay Rule by publishing written guidance as well as hosting a webinar for members.

### *1. The Holiday Pay Rule Mandates that Plaintiffs' Members Nearly Double the Number of Paid Holidays.*

The Holiday Pay Rule mandates that "nursing home employers" pay "nursing home workers" time-and-a-half "holiday pay" for 11 specific holidays. The problem, however, is that Plaintiffs' members did not recognize 11 holidays for purposes of premium pay. Instead, Plaintiffs' members generally recognized six or seven holidays. (See Brown Decl. ¶ 8; Hejhal Decl. ¶ 8; Greely Decl. ¶ 7.) Of the examples submitted with this Memorandum, none of the organizations recognize the following five holidays for purposes of premium pay: (1) Martin Luther King Day, (2) Presidents Day, (3) Juneteenth, (4) Indigenous Peoples' Day, and (5) Veterans Day. What is more, Plaintiffs' members who are affiliated with religious organizations typically recognize religious holidays that are not state holidays, such as Easter. (See Brown Decl. ¶¶ 2, 8; Greely Decl. ¶¶ 2, 7.) As a result of the Holiday Pay Rule, Plaintiffs' members are forced to pay time-and-one-half to all "nursing home workers" who work on all 11 holidays recognized by state law.

In addition, even for those holidays recognized by Plaintiffs' members, Plaintiffs' members do not always pay holiday premium pay for the 24-hour periods starting at midnight on the holiday. Instead, some members have holiday pay practices that follow employees' schedules, such as 10:00 p.m. the day before the holiday (which is typically the start of the overnight or "NOC" shift) and ending at 10:00 p.m. on the holiday.

### 2. *The Holiday Pay Rule Will Cause Significant Financial Hardship to Plaintiffs' Members.*

Because Plaintiffs' members do not pay premium pay for work on all of the 11 state holidays recognized by the Holiday Pay Rule, two of Plaintiffs' members estimate that their organizations will incur unrecoverable costs in excess of ***$700,000 per year***, (Brown Decl. ¶ 14), and ***$545,975 per year***, (Hejhal Decl. ¶ 14). One of Plaintiffs' smaller members, a member who operates only ***one facility*** in Albert Lea, Minnesota, reported that it will incur costs in excess of ***$54,000 per year***. (Greely Del. ¶ 14.) If the Holiday Pay Rule is unconstitutional or held to be invalid, Plaintiffs' members have no means of recovering these costs. (Brown Decl. ¶ 15; Hejhal Decl. ¶ 15; Greely Del. ¶ 15.)

According to one of Plaintiffs' members, the financial impact of the Holiday Pay Rule will significantly impact her organization and the skilled-nursing industry as a whole:

> The NHWSB mandate leaves our [Skilled Nursing Facilities or "SNFs"] struggling to cover the additional costs imposed by the Holiday Pay Rule. The current rate structure lacks a timely and responsive recovery mechanism, and any potential relief is at least 27 months away. This unfunded situation places a significant burden on our SNFs, forcing them to absorb these extra costs without immediate financial support. The absence of a clear path to offset these expenses exacerbates the financial strain, making it challenging to maintain operations and provide quality care. While the intentions of the NHWSB may be good, the actual impact will be detrimental to SNFs providing essential care to Minnesota's aging population, as we . . . do not have the revenue source to cover costs imposed by external decision makers.

(Hejhal Decl. ¶ 13.)

#### 3. *The Holiday Pay Rule Creates Artificial Distinctions Between Workers Employed by Plaintiffs' Members.*

Plaintiffs' members generally do not operate standalone "nursing homes" as defined by Minn. Stat. § 181.211, subd. 7. Instead, most nursing homes operated by Plaintiffs'

members are co-located on a larger campus that provides other senior services and living arrangements, such as assisted living, independent living, and adult-day services ("Hybrid Facilities"). (See Brown Decl. ¶¶ 4-5; Hejhal Decl. ¶¶ 4-5; Greely Decl. ¶¶ 4-5.) These portions of the campus are not classified as a "nursing home" as defined by Minn. Stat. § 181.211, subd. 7 ("non-Nursing Home facilities") and they are therefore not subject to the Holiday Pay Rule. (See Brown Decl. ¶¶ 4-5; Hejhal Decl. ¶¶ 4-5; Greely Decl. ¶¶ 4-5.)

For example, one of Plaintiffs' members operates a single senior living facility located at 1201 Garfield Avenue in Albert Lea, Minnesota. (Greely Decl. ¶ 4.) The campus includes several interconnected buildings that provide different living options to seniors, including: independent living, assisted living, the health care center / skilled nursing; rehabilitation / short term transitional care; and the design center. While portions of the campus are classified as a "nursing home" by Minn. Stat. § 181.211, subd. 7, such as the "health care center / skilled nursing," other portions of the campus, such as assisted living and independent living, are not classified as a "nursing home" for purposes of the Holiday Pay Rule. (Greely Decl. ¶ 4.)

Applying the Holiday Pay Rule to Hybrid Facilities – such as the senior living facility located at 1201 Garfield Avenue in Albert Lea, Minnesota – is difficult because employees working in a "nursing home" are not paid differently than employees working elsewhere on the campus. (See Brown Decl. ¶¶ 4-6; Hejhal Decl. ¶¶ 4-6; Greely Decl. ¶¶ 4-6.) Stated differently, the pay policies of Plaintiffs' members do not distinguish between employees who work in a "nursing home" as defined by the Holiday Pay Rule and

employees who perform work in non-Nursing Home facilities that may be connected to or in the same building as the "nursing home."

What is more, at Hybrid Facilities, some workers perform work throughout the campus. (See Brown Decl. ¶¶ 4-5; Hejhal Decl. ¶¶ 4-5; Greely Decl. ¶¶ 4-5.) That is, they perform work in the Nursing Home and in non-Nursing Home facilities. For example, dietary employees may deliver meals to residents in the Nursing Home and to residents in independent or assisted living. Similarly, environmental services employees may clean areas of the Nursing Home as well as areas of the assisted living or independent living.

#### 4. *The Holiday Pay Rule Upends Existing Labor Contracts and Gives Unions a Powerful Weapon in Collective Bargaining.*

For Plaintiffs' members who employ workers in accordance with a collective bargaining agreement ("CBA"), the CBA generally specifies the holiday pay practices that are specific to these employees. (See Brown Decl. ¶ 9.) This can include holidays that are not covered by the Holiday Pay Rule, such as Christmas Eve, Easter, and the Friday after Thanksgiving. Nevertheless, the employer must negotiate and reach agreement with the labor union representing employees before it can make any changes to its pay practices. (See Hejhal Decl. ¶ 11.) For example, an employer paying double-time to employees on six holidays could not unilaterally reduce its pay to one-and-one-half for the 11 state holidays mandated by the Holiday Pay Rule. Instead, federal labor law would arguably permit the labor union to hold those extra holidays "hostage" and require that the employer continue paying double-time on those holidays and pay time-and-one-half on the five additional state holidays mandated by the Holiday Pay Rule. In addition, one of Plaintiffs'

members reports that its holiday pay times do not begin at midnight, so it is forced to pay additional holiday pay to workers in the absence of an agreement with its employees' exclusive bargaining representative. (See Hejhal Decl. ¶ 11.)

As it relates to implementing the Holiday Pay Rule, one of Plaintiffs' members has been threatened with "grievances," "unfair labor practice charges," and "contact[ing] the appropriate governing agencies" by unions representing "nursing home workers." (Brown Decl. ¶ 10.) The same member also reported that "[t]he Holiday Pay Rule has . . . been used by union representatives during collective bargaining to try to obtain additional concessions from [the employer]." (Id.)

#### 5. *The Holiday Pay Rule Authorizes Employers to "Negotiate" with their Non-Union Workers.*

For Plaintiffs' members who employ workers who are not covered by a CBA, the Holiday Pay Rule authorizes a form of "bargaining" with a "majority" of its "nursing home workers."

For example, one of Plaintiffs' members described the process by which it proposed to its employees to "convert the seven (7) holidays that were paid at "double time" or "time-and-one-half" to eleven (11) holidays paid at time-and-one-half, including Easter and Christmas Eve in place of Veteran's Day and President's Day." (Brown Decl. ¶ 11.) The employer prepared a ballot, and employees "voted" on the employer's proposal. (Id., Ex. 1.)

### *6. The Holiday Pay Rule Lacks Crucial Definitions.*

Plaintiffs and their members agree that the Holiday Pay Rule has been particularly difficult to implement "given the absence of a definition of key terms, such as 'administrative staff' and 'supplemental nursing services agency,' and 'services,' as well as circular definitions of 'nursing home employer' and 'nursing home worker.'" ((See Brown Decl. ¶ 12; Hejhal Decl. ¶ 12; Greely Decl. ¶ 9.) For example, "administrative staff" are specifically excluded from the definition of "nursing home worker," but it is unclear who is considered "administrative staff."

## LEGAL STANDARD

The procedures for issuance of injunctive relief are set forth in Rule 65 of the Federal Rules of Civil Procedure. The Eighth Circuit has identified four factors that should be considered in determining whether to grant the requested relief:

1. The threat of irreparable harm to the moving party if an injunction is not granted;

2. The harm suffered by the moving party if injunctive relief is denied as compared to the effect on the non-moving party if the relief is granted;

3. The probability that the moving party will succeed on the merits; and

4. The public interest.

Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 113-14 (8th Cir. 1981). "A court issues a preliminary injunction in a lawsuit to preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the lawsuit's merits." Devose v. Herrington, 42 F.3d 470, 471 (8th Cir. 1994); Kelley v. First Westroads Bank, 840 F.2d 554, 558 (8th

Cir. 1988) ("[T]he well-established function of a temporary restraining order is to maintain the status quo.").

Here, Plaintiffs readily satisfy this standard for each of the four elements set forth in Dataphase, including the element of immediate and irreparable injury. No harm will result from delaying implementation of the Holiday Pay Rule until the Court can consider the clear federal preemption of the law.

## LEGAL ANALYSIS

Plaintiffs readily satisfy this standard for each of the four elements set forth in Dataphase, including the element of immediate and irreparable injury. No harm will result from briefly delaying implementation of the Holiday Pay Rule until the Court can consider the clear federal preemption of the law.

### I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BECAUSE FEDERAL LABOR LAW PREEMPTS THE HOLIDAY PAY RULE UNDER BOTH GARMON PREEMPTION AND MACHINISTS PREEMPTION.

Plaintiffs have a substantial likelihood of success on the merits, which is the key factor in the Court's analysis. For purposes of injunctive relief, Plaintiffs can clearly demonstrate that they will prevail on their claim that the Holiday Pay Rule is preempted by the NLRA and therefore violates the Supremacy Clause of the United States Constitution.

The NLRA governs labor-management relations in the private sector. The NLRA, itself, is silent on the issue of preemption. Nonetheless, the courts have implied a broad scope of preemption premised on two different, but complementary, substantive theories.

The Holiday Pay Rule is preempted by the NLRA because (1) it authorizes activity that is arguably prohibited by Section 8(a)(2) of the NLRA (known as "Garmon preemption") and (2) it regulates conduct Congress intended to leave unregulated, such as bargaining between independent contractors and the entities that hire them (known as "Machinists preemption").

**A. Garmon Preemption.**

In San Diego Building Trades Council v. Garmon, 359 U.S. 236 (1959), the Supreme Court held that the NLRA preempts the states from regulating conduct that is "***arguably protected or prohibited***" by the NLRA. The "arguably protected or prohibited" test broadly preempts state laws and claims without regard to the substance of the state regulation. Under Garmon, states are prohibited from not only setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, but also from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the NLRA.[2]

For example, in United Steelworkers v. St. Gabriel's Hosp., 871 F. Supp. 335 (D. Minn. 1994), Judge Doty held that the Minnesota Hospital Successor Statute, Minn. Stat. § 338.01 et seq., was preempted under Garmon because, contrary to Section 8(d) of the NLRA, the state statute compels "a new employer to honor, against its will, the terms of a

[2] There are two exceptions to Garmon preemption. Under the Garmon exceptions, conduct that is "arguably protected or prohibited" by the NLRA is ***not*** preempted if: (1) the conduct is only a peripheral concern of the NLRA or (2) the conduct "touches interests deeply rooted in local feeling and responsibility." Belknap, Inc. v. Hale, 463 U.S. 491, 498 (1983); Garmon, 359 U.S. at 243-44. Neither are applicable in this case.

collective bargaining agreement negotiated by its predecessor." Id. at 341. As Judge Doty explained: "By binding new employers to collective bargaining agreements against their will, Minnesota's successor statute impermissibly undermines federal labor law policy designed to ensure the free transfer of capital." Id. at 342.

Here, the Holiday Pay Rule is preempted because it specifically authorizes non-union employers to violate Section 8(a)(2) of the NLRA by engaging in "negotiations" with a "majority" of their unrepresented employees. Section 7 of the NLRA guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection," as well as the right "to refrain from any or all such activities."

The Holiday Pay Rule provides that adjustments to holiday pay may be agreed upon "by a majority of affected nursing home workers":

> **Subp. 2. Modification of holiday date and time.**
>
> A. The start and stop times for the 24-hour period comprising a holiday can be modified by a nursing home employer ***if agreed upon by a majority of affected nursing home workers*** or the exclusive representative of the affected nursing home workers if one exists.
>
> B. A nursing home employer may substitute up to four holidays for an alternate day in the same calendar year if the substitution is agreed upon ***by a majority of affected nursing home workers*** or the exclusive representative of the affected nursing home workers if one exists. . . .

(emphasis added). The Holiday Pay Rule appears to require an annual process that must occur each year for the following calendar year.

In fact, the NHWSB published regulatory guidance specifically authorizing non-union employers to engage in "bargaining" with their non-union employees:

> *Q: I want to switch 4 holidays on the list for other holidays. We are not unionized. How do we determine how to arrive at agreement on this with a majority of affected nursing home workers?*
>
> A: First determine who in your staff qualify as nursing home workers under the rules. A majority would be fifty percent of those workers plus one. ***Then find a way to discuss and make a decision together.*** This could be ***a meeting with a vote at the end, a survey monkey, a petition in the break room, or any other reasonable way for workers to let their voices be heard***. Just keep in mind that you will need to keep a record of the agreement for a minimum of 3 years after the observation of the modified holiday. That could look like meeting minutes, records of vote numbers and when the vote was held, a copy of the petition or something similar.

(emphasis added).[3]

Section 8(a)(2) of the NLRA prohibits any employer (union and non-union) from "dominat[ing] or interfer[ing] with the formation or administration" of a "labor organization."[4] To determine whether a violation of Section 8(a)(2) has occurred, the

[3] Available at: https://www.dli.mn.gov/sites/default/files/pdf/nhwsb_how_to_holiday_pay_111424.pdf

[4] Section 8(a)(2) provides in relevant part:

> It shall be an unfair labor practice for an employer—
>
> . . .
>
> (2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: Provided, That subject to rules and regulations made and published by the Board pursuant to section 6 [section 156 of this title], an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;

29 U.S.C. § 158(a)(2).

National Labor Relations Board ("NLRB"), which is the federal agency responsible for interpreting federal labor law, performs a two-step inquiry. Electromation, Inc., 309 NLRB 990 (1992), enfd. 35 F.3d 1148 (7th Cir. 1994). First, the NLRB considers whether the entity involved is a "labor organization" as defined by the NLRA. Second, the NLRB considers whether the employer has engaged in any of the forms of conduct proscribed by §8(a)(2), *i.e.*, domination or interference with the organization's formation or administration, or unlawful support of the organization. In this case, both factors are satisfied.

### ***1. The Holiday Pay Rule Creates a "Labor Organization" as Defined by the NLRA.***

The NLRA's definition of labor organization is broad. Section 2(5) does not require labor organizations to have any formal structure:

> The term "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

29 U.S.C. § 152(5). A group of individuals may comprise a labor organization even though it lacks a constitution or bylaws, elected officials, formal meetings, dues, or other formal structure. See S&W Motor Lines, Inc., 236 NLRB 938, 942 (1978). Under Section 2(5) of the NLRA, a "labor organization" exists if:

(1) Employees participate,

(2) There is a "purpose to deal with [the] employer[],"

(3) The group "concern[s] itself with conditions of employment or other statutory subjects," and

(4) There is "evidence that the committee is in some way representing the employees."

Electromation, Inc., 309 NLRB at 996. Each element is met in this case.

*First*, employees participate. Indeed, the Holiday Pay Rule makes clear that employees participate in the decision to change "the start and stop times for the 24-hour period comprising a holiday" and to "substitute up to four holidays for an alternate day in the same calendar year." According to guidance from the NHWSB, this can be done in "a meeting with a vote at the end, a survey monkey, a petition in the break room, or any other reasonable way for workers to let their voices be heard." Regardless of how the decision is made, employees clearly participate.

*Second*, the sole purpose of the group created by the Holiday Pay Rule is to "***deal with***" their employers regarding holidays and the start and stop times for paid holidays. The term "dealing with" is broader than "collective bargaining" and "applies to situations that do not contemplate the negotiation of a collective-bargaining agreement." Electromation, 309 NLRB at 995; see also NLRB v. Cabot Carbon Co., 360 U.S. 203, 213 (1959) (holding that an employee group may be a labor organization if it exists even in part to "deal" with the employer, regardless of whether it is engaged in collective bargaining). In this case, the group of "affected nursing home workers" described by the Holiday Pay Rule actually engages in "bargaining" with the employer by responding to the employer's proposals regarding alternative holidays and holiday pay start times and end times. Stated differently, the Holiday Pay Rule authorizes a group of "affected nursing home workers" to accept or reject their employer's proposals regarding up to four alternative paid holidays

and holiday pay start and stop times. Guidance published by Defendant describes a process for a "meeting," "discuss[ion]," and then "***mak[ing] a decision together.***" This is clearly "dealing with" the employer as contemplated by Section 2(5) of the NLRA. See, e.g., Ona Corp., 285 NLRB 400, 405 (1987) (employee action committee made proposals regarding vacations and floating holiday schedules); St. Vincent's Hospital, 244 NLRB 84, 85-86 (2979) (employee committee made proposals on several issues including wages, hours and vacations); Ampex Corp., 168 NLRB 742, 746-47 (1967), enfd. 442 F.2d 82 (7th Cir.1971), cert. denied 404 U.S. 939 (1971) (committee presented suggestions to the employer on behalf of all employees as to subjects pertaining to working conditions). Further, as noted above, the Holiday Pay Rule envisions that this bilateral process will take place each year: "Any agreement to modify a holiday date or time must be made in the calendar year preceding the start of the calendar year in which the modified holiday is observed." As a result, each year, the group of "affected nursing home workers" will negotiate with their employer and either accept or deny their employer's proposals regarding holiday pay. Clearly, the Holiday Pay Rule creates an employee group that "deals with" employers.

*Third*, the group of "affected nursing home workers" deals with their employer on mandatory topics of bargaining. Wages, including any premium pay for working on a holiday and the hours that premium is paid, are mandatory subjects of bargaining. NLRB, GC Memo. No. 93-4, 1993 WL 595235 (April 15, 1993) ("Under Section 2(5), a labor organization includes any organization in which employees participate and which deals with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."). Indeed, under Section 8 of the NLRA, an employer

is required to bargain "in good faith with respect to ***wages***, ***hours***, and other terms and conditions of employment . . . ." 29 U.S.C. § 158(d) (emphasis added).

*Finally*, the group created by the Holiday Pay Rule actually represents workers because a majority of the group (i.e., 50 percent plus one) makes the decision for all other "affected nursing home workers." For example, if 51 percent of the "affected nursing home workers" desire to substitute one holiday (e.g., Presidents' Day) for another holiday (e.g., Christmas Eve or the day after Thanksgiving), then that decision would bind the other 49 percent of "affected nursing home workers." This is the type of "representation" contemplated by the NLRB in its definition of a "labor organization." See Electromation, Inc., 309 NLRB at 994 ("[I]f the organization has as a purpose the representation of employees, it meets the statutory definition of 'employee representation committee or plan' under Section 2(5) and will constitute a labor organization if it also meets the criteria of employee participation and dealing with conditions of work or other statutory subjects.").

***2. The Holiday Pay Rule Creates Unlawful Domination or Assistance of the "Affected Nursing Home Workers."***

Section 8(a)(2) prohibits employer domination or interference with the formation and administration of any labor organization, or the giving of financial or other support to it. In Electromation, the Board noted that:

> Although Section 8(a)(2) does not define the specific acts that may constitute domination, a labor organization that is the creation of management, whose structure and function are essentially determined by management . . . and whose continued existence depends on the fiat of management, is one whose formation or administration has been dominated under Section 8(a)(2). In such an instance, actual domination has been established by virtue of the employer's specific acts of creating the organization itself and determining its structure and function.

309 NLRB at 995-96. The Board added that Section 8(a)(2) does not require a finding of antiunion animus or a specific motive to interfere with Section 7 rights. See, e.g., Keeler Brass Automotive Group, 317 NLRB 1110 (1995) (employer unlawfully dominated grievance committee by creating the committee and determining its structure and function).

Unlawful employer assistance, as opposed to domination, exists when an employer interferes with the formation or administration of a labor organization, but when that organization is not subjugated to the employer's will. For example, in Duquesne University, 198 NLRB 891 (1972), the Board found that the employer unlawfully assisted an employee committee when it paid the employees for time spent working on the committee and provided administrative support.

Here, the Holiday Pay Rule creates a group of "affected nursing home workers" that is inherently dominated and assisted by their employer in violation of Section 8(a)(2). Specifically, the Holiday Pay Rule and guidance issued by Defendant provide that the employer can dictate the time and format for making decisions about holiday pay:

> [F]ind a way to discuss and make a decision together. This could be a meeting with a vote at the end, a survey monkey, a petition in the break room, or any other reasonable way for workers to let their voices be heard. Just keep in mind that you will need to keep a record of the agreement for a minimum of 3 years after the observation of the modified holiday. That could look like meeting minutes, records of vote numbers and when the vote was held, a copy of the petition or something similar.

The employer is tasked with scheduling the meeting, outlining the agenda, and recording the decision made by a majority of "affected nursing home workers." This is unlawful domination and assistance as contemplated by the NLRA. See, e.g., Keeler Brass



4375080.v1

Automotive Group, 317 NLRB 1110 (1995) (employer unlawfully dominated grievance committee by creating the committee and determining its structure and function). Clapper's Manufacturing, 186 NLRB 324, 332–334 (1970), enfd. 458 F.2d 414 (3rd Cir. 1972) (employer suggested the form and structure of the committee, established its purpose, and retained power to determine its composition); Han–Dee Spring & Mfg. Co., 132 NLRB 1542 (1961) (employer organized and determined nature, structure and function of employee grievance committee); Wahlgren Magnetics, 132 NLRB 1613 (1961) (employer initiated and sponsored employee representation committee, permitted the use of company time and property for meetings and paid employees while they met with their representatives).

To the extent Defendant seeks to justify the Holiday Pay Rule by arguing that it is the creation of state law and therefore cannot be considered a "labor organization" or a violation of Section 8(a)(2), Defendant would be wrong. This argument was considered and rejected by the NLRB in Goody's Family Clothing, Inc., Case 10-CA-26718, 1993 WL 726790, (Div. of Advice Sept. 21, 1993).

In Goody's Family Clothing, the NLRB's Division of Advice considered whether a safety committee mandated by state law constituted a "labor organization" that was unlawfully dominated or interfered with the by the employer. The NLRB made clear that the state law was preempted under Garmon and therefore the state law offered no justification for the employer's violation of Section 8(a)(2):

> We reject the Employer's defense to the Section 8(a)(2) and (5) allegations, that the Tennessee law requires it to deal with the Safety Committee

> concerning mandatory subjects of bargaining, because the state law is preempted by the NLRA.
>
> In Brown v. Hotel Employees, 468 U.S. 491 (1984), the Court held that where a state regulation actually conflicts with the NLRA, i.e., where it either penalizes conduct protected by the Act or permits conduct prohibited by the Act, ***the federal law must prevail by operation of the Supremacy Clause of the Constitution***. . . .
>
> The Tennessee law at issue here directly conflicts with Section 8(a)(2) and (5) of the NLRA. It requires that employers set up safety committees which clearly are "labor organizations" under Section 2(5) of the Act, i.e., they must have employee members and they must "deal with" employers regarding safety issues, which are conditions of employment. Further, the Tennessee law requires that the committees be set up in such a way that they are inevitably dominated by employers within the meaning of Section 8(a)(2)—i.e., employers create the committees, determine their structure and procedures, set their agendas in accordance with the law, pay employees to attend meetings, and even determine which employees will serve on the committees.[] . . . Since the Tennessee law actually conflicts with federal prohibitions under Sections 8(a)(2) and (5) and, indeed, directly undermines the Congressionally-recognized policies supporting these prohibitions,[] it is preempted under Brown . . . .

Id. at 3-4 (footnotes omitted) (emphasis added).

Like the safety committees established by the state in Goody's Family Clothing, the Holiday Pay Rule actually conflicts with federal labor law because it creates a group of "affected nursing home workers" that is unlawfully dominated and assisted by their employer in violation of Section 8(a)(2). Accordingly, the Holiday Pay Rule is clearly preempted by the NLRA.

Lastly, it is important to remember that it is not necessary for the Court to find that the Holiday Pay Rule actually causes employers to violate Section 8(a)(2) in order for Garmon preemption to apply. (See, e.g., Brown Decl. ¶ 11, Ex. 1.) Instead, the Court need only find that the Holiday Pay Rule authorizes conduct that is "***arguably . . . prohibited***"

by the NLRA. Here, the Holiday Pay Rule expressly authorizes employers to create a form of "bargaining" or "meeting" where a majority of employees make a decision for the remaining employees regarding holiday pay and hours. This is akin to "bargaining" as understood by Section 7 of the NLRA and likely causes employers to violate Section 8(a)(2) of the NLRA. As a result, the Holiday Pay Rule is preempted by the Supreme Court's decision in Garmon.

**B. Machinist Preemption.**

In Machinists v. Wisconsin Employment Relations Commission, Lodge 76, Intern. Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Wisconsin Employment Relations Commission, 427 U.S. 132 (1976), the Supreme Court held that a state may not regulate conduct, even if it is neither protected nor prohibited by the NLRA, that is within the zone of activity that Congress meant to be left to the free play of economic forces.

The NLRA preempts state and local laws regulating activities that Congress intended to be left unregulated and thus subject to the natural "balance of power between labor and management expressed in our national labor policy." Machinists, 427 U.S. at 140, 146. Where Congress intentionally left conduct to "the free play of economic forces," localities may not regulate. Id.; see also Midwest Motor Exp., Inc. v. International Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 120, 512 N.W.2d 881 (Minn. 1994) (finding that Minn. Stat. § 179.12(9) was preempted because it "interferes . . . with the substantive aspects of the bargaining process by branding as unlawful an economic device Congress intended to be unregulated.").

For example, in Thunderbird Mining Co. v. Ventura, 138 F. Supp. 2d 1193, 1196 (D. Minn. 2001), two taconite mining companies challenged portions of the Minnesota Iron Range Resources and Rehabilitation Board's (the "IRRRB") enabling statute. Specifically, the companies argued that Minn. Stat. § 298.227 impermissibly interfered with the collective bargaining process by requiring that certain state funds could be released to the company only if the IRRRB received authorization from a majority of the members of the company's joint committee of labor and management. Under Minn. Stat. § 298.227, employee representatives at union employers were appointed by the local union. According to the companies, "[t]he statute's practical effect . . . has been to provide a 'weapon' to Local Steelworkers Unions for use during collective bargaining with taconite producers." Id.

In finding Minn. Stat. § 298.227 preempted pursuant to Machinists preemption, Judge Rosenbaum reasoned:

> ***Minnesota's statutory scheme intrudes into the collective bargaining process.*** The Court finds it does so by granting substantial economic power to the Union, aiding it in wresting concessions from management. "Machinists indicates that the States are not free, entirely and always, directly to enhance the self-help capability of one of the parties to such a dispute so as to result in a significant shift in the balance of bargaining power struck by Congress." New York Telephone Co. v. New York State Dept. of Labor, 440 U.S. 519, 548–49 (1979) (Blackmun, J., concurring).
>
> ***Minn. Stat. § 298.227 improperly shifts the carefully crafted "balance of bargaining power struck by Congress."*** That the shift is indirect is irrelevant: A state may not accomplish indirectly what it is forbidden to accomplish directly. Under the federal labor law's broad preemptive scope, "the State has no authority to introduce its own standard of 'properly balanced bargaining power,'" whether the introduction of that standard occurs explicitly or implicitly. See St. Gabriel's, 871 F. Supp. at 344.

> The Court, of course, recognizes that federal preemption still affords states a degree of power to regulate aspects of the relationship between labor and management. ***But it cannot seriously be argued that § 298.227 falls within the sort of general regulation permitted under the NLRA*** . . . . Minnesota's statute—involving, as it does, a cash-dollar impact, rather than a business or community regulating regime—does more than simply alter the backdrop against which negotiations take place; it alters the very negotiating process itself. This is an impermissible intrusion into the field of federal labor law.
>
> Although § 298.227's impact is more subtle than the statute at issue in Employers Association, Inc. v. United Steelworkers, 32 F.3d 1297 (8th Cir. 1994), its result is the same: "The statute permanently and substantially shifts the terms of bargaining in favor of the union . . . '[it] has materially altered the Congressionally defined equilibrium which exists between management and organized labor in collective bargaining negotiations.'" Id. at 1299 (citation omitted). Such a mechanism is forbidden under federal law.

Id. at 1199-200 (emphasis added).

Likewise, in Chamber of Commerce v. Bragdon, 64 F.3d 497 (9th Cir. 1995), the Ninth Circuit held that Machinists preemption was applicable to a county ordinance that applied "prevailing wage" requirements to non-governmental construction projects within the county. The Ninth Circuit reasoned that the Machinists principle (that the collective bargaining process should be controlled by the free play of economic forces) "can be frustrated by the imposition of substantive requirements," and that some substantive requirements could "virtually dictate the results of the contract." Id. at 501. The court concluded that the ordinance was preempted under this reasoning because it did not merely require a "general" minimum wage for such projects, but imposed detailed wage and benefit requirements for a variety of crafts. Id. at 502-04; see also 520 S. Mich. Ave. Assocs., Ltd. v. Shannon, 549 F.3d 1119, 1127, 1129-30 (7th Cir. 2008) (holding that state

law was preempted because it applied "to one occupation, in one industry, in one county" and was not a "a true 'minimum' labor standard").

Here, like the state laws at issue in Bragdon and Thunderbird Mining, the Holiday Pay Rule is preempted because it improperly shifts the carefully crafted "balance of bargaining power struck by Congress." Contrary to any claim by Defendant, the Holiday Pay Rule is not a "minimum state labor standard" as described by the Supreme Court in Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724 (1985) and Fort Halifax Packing Co., Inc. v. Coyne, 482 U.S. 1 (1987).

*First*, the Holiday Pay Rule provides specifically when the holiday pay wage must be paid and how the employer and the union can negotiate changes in the hours of the holiday and change up to four holiday dates. This micro-management cannot be viewed as setting forth a minimum labor standard. For example, in 520 South Michigan Avenue Associates v. Shannon, 549 F.3d 1119 (7th Cir. 2008), the Seventh Circuit held that a law "is not a law of general application" if it "applies to one occupation, in one industry, in one county." Id. at 1139. As noted above, the Holiday Pay Rule applies to one class of employees who perform work in a "nursing home" and does not apply to other workers in Hybrid Facilities simply because the worker performs their work in a different portion of the campus or facility. Likewise, in Bragdon, the Ninth Circuit held that a law "which is not of general application, but targets particular workers in a particular industry . . . affects the bargaining process in a way that is incompatible with the general goals of the NLRA." Minimum labor standards include such things as minimum wages, American Hotel & Lodging Association v. City of Los Angeles, 834 F.3d 958, 963 (9th Cir. 2016), minimum



4375080.v1

insurance benefits, MetLife Ins., 471 U.S. at 727, or one-time severance payments, Fort Halifax, 482 U.S. at 23, generally leaving decisions about how to negotiate or operationalize these requirements to the businesses and companies.

*Second*, the Holiday Pay Rule does not "merely provide the backdrop for negotiations" as minimum labor standards do. American Hotel & Lodging Association v. City of Los Angeles, 834 F.3d 958, 963 (9th Cir. 2016) (quotation marks omitted). By prescribing the manner and means by which employers and unions can agree to the holiday hours and dates, the Holiday Pay Rule interferes with the entire process of collective bargaining. And by creating the possibility of penalties against an employer for any infraction, it would be absurd to describe the Holiday Pay Rule as merely "set[ting] the stage for [collective] bargaining." Id. at 964. The draconian nature of the Holiday Pay Rule is further underscored by the fact that the Holiday Pay Rule does not allow a party to opt out of its "formidable enforcement scheme," Chamber of Commerce v. Brown, 554 U.S. 60, 63 (2008) – unlike other statutes that have been upheld as minimum labor standards. Compare American Hotel, 834 F.3d at 965; Associated Builders & Contractors v. Nunn, 356 F.3d 979, 982 (9th Cir. 2004) ("Participation in the regulatory scheme is entirely voluntary.").

*Third*, the structure of the NHWSB itself is strikingly similar to multi-employer bargaining, which is unlawful under the NLRA unless all of the participating employers are signatory to CBAs with the individual union and the employees are represented by the union. Specifically, the NHWSB includes "three members who represent nursing home employers or employer organizations" and "three members who represent nursing home



4375080.v1

workers or worker organizations." Minn. Stat. § 181.212, subd. 1. It is true that the NHWSB also includes the commissioners of human services, health, and labor and industry (or their designees), but this does little to cloak what would otherwise be considered unlawful collective bargaining between representatives from employers and labor unions who do not represent the workers at issue.

Make no mistake: nothing about the Holiday Pay Rule is "neutral." Machinists, 427 U.S. at 156 & n.* (Powell, J., concurring). To the contrary, it openly "reflect[s] an accommodation of the special interests" of the union, id., and thus "is more properly characterized as an example of an interest group deal in public-interest clothing," Bragdon, 64 F.3d at 503 (quotation marks omitted). This has the impact of reducing the incentive for parties to engage in collective bargaining and, instead, "redirect efforts of employees not to bargain with employers, but instead, to seek to set minimum wage and benefit packages with political bodies." Id. at 504. Accordingly, it is preempted by federal labor law.

Because Plaintiffs are likely to succeed on the merits, injunctive relief is warranted to preserve the status quo pending resolution of this proceeding.

## II. THERE IS A THREAT TO PLAINTIFFS OF IRREPARABLE HARM.

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." Gen. Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 319 (8th Cir. 2009); see also Marigold Foods, Inc. v. Redalen, 834 F. Supp. 1163, 1170 (D. Minn. 1993) (finding irreparable harm where "the harm will not be compensable through an award of monetary damages"). As

set forth in detail above, the harm threatened by the Holiday Pay Rule is not only financial but it creates previously non-existent distinctions between classes of workers depending on the location of their work, it expressly authorizes Plaintiffs' members to engage in unlawful collective bargaining with their employees in violation of Section 8(a)(2) of the NLRA, it provides existing labor unions with significant bargaining power mid-contract, and it creates compliance and legal risks for Plaintiffs' members.

*First*, the Holiday Pay Rule mandates that plaintiffs' members nearly double the number of paid holidays that they currently recognize. Because Plaintiffs' members do not pay premium pay for work on all of the 11 state holidays recognized by the Holiday Pay Rule, two of Plaintiffs' members estimate that their organizations will incur unrecoverable costs in excess of ***$700,000 per year***, (Brown Decl. ¶ 14), and ***$545,975 per year***, (Hejhal Decl. ¶ 14). One of Plaintiffs' smaller members, a member who operates only ***one facility*** in Albert Lea, Minnesota, reported that it will incur costs in excess of ***$54,000 per year***. (Greely Del. ¶ 14.) If the Holiday Pay Rule is unconstitutional or held to be invalid, Plaintiffs' members have no means of recovering these costs. (Brown Decl. ¶ 15; Hejhal Decl. ¶ 15; Greely Del. ¶ 15.)

As one of Plaintiffs' members described, the financial impact of the Holiday Pay Rule will significantly impact her organization and other skilled-nursing facilities (or "SNFs"):

> The NHWSB mandate leaves our SNFs struggling to cover the additional costs imposed by the Holiday Pay Rule. The current rate structure lacks a timely and responsive recovery mechanism, and any potential relief is at least 27 months away. This unfunded situation places a significant burden on our SNFs, forcing them to absorb these extra costs without immediate financial

> support. The absence of a clear path to offset these expenses exacerbates the financial strain, making it challenging to maintain operations and provide quality care. While the intentions of the NHWSB may be good, the actual impact will be detrimental to SNFs providing essential care to Minnesota's aging population, as we . . . do not have the revenue source to cover costs imposed by external decision makers.

(Hejhal Decl. ¶ 13.)

*Second*, the Holiday Pay Rule creates artificial distinctions amongst the workers employed by Plaintiffs' Members. For example, under the Holiday Pay Rule, employees working at Hybrid Facilities may be paid differently depending on where in the facility they are working. This is contrary to the pay practices of Plaintiffs' members. (See Brown Decl. ¶¶ 4-5; Hejhal Decl. ¶¶ 4-5; Greely Decl. ¶¶ 4-5.)

*Third*, the Holiday Pay Rule authorizes a form of "bargaining" with a "majority" of its "nursing home workers" in violation of Section 8(a)(2) of the NLRA. For example, one of Plaintiffs' members described the process by which it proposed to its employees to "convert the seven (7) holidays that were paid at "double time" or "time-and-one-half" to eleven (11) holidays paid at time-and-one-half, including Easter and Christmas Eve in place of Veteran's Day and President's Day." (Brown Decl. ¶ 11.) The employer prepared a ballot, and employees "voted" on the employer's proposal. (Id., Ex. 1.)

*Fourth*, the Holiday Pay Rule upends existing labor contracts and gives unions a powerful weapon in collective bargaining. For example, an employer paying double-time to employees on six holidays could not unilaterally reduce its pay to one-and-one-half for the 11 state holidays mandated by the Holiday Pay Rule. Instead, federal labor law would arguably permit the labor union to hold those extra holidays "hostage" and require that the

employer continue paying double-time on those holidays and pay time-and-one-half on the five additional state holidays mandated by the Holiday Pay Rule. In addition, one of Plaintiffs' members reports that its holiday pay times do not being at midnight, so it is forced to pay additional holiday pay to workers in the absence of an agreement with its employees' exclusive bargaining representative. (See Hejhal Decl. ¶ 11.) What is more, one of Plaintiffs' members has been threatened with "grievances," "unfair labor practice charges," and "contact[ing] the appropriate governing agencies" by unions representing "nursing home workers." (Brown Decl. ¶ 10.) The same member also reported that "[t]he Holiday Pay Rule has . . . been used by union representatives during collective bargaining to try to obtain additional concessions from [the employer]." (Id.)

*Finally*, the Holiday Pay Rule lacks definitions of key terms, including "'administrative staff' and 'supplemental nursing services agency,' and 'services,' as well as circular definitions of 'nursing home employer' and 'nursing home worker.'" ((See Brown Decl. ¶ 12; Hejhal Decl. ¶ 12; Greely Decl. ¶ 9.) For example, "administrative staff" are specifically excluded from the definition of "nursing home worker," but it is unclear who is considered "administrative staff."

As one of Plaintiffs' members described:

> This ambiguity has led to varied interpretations across different departments and locations, causing inconsistent application of the rule for the one holiday we have had so far this year. In addition, while the Holiday Pay Rule applies based on where an employee works, SFHS' employment practices do not distinguish between workers who work in one of its Nursing Homes or in one of its non-Nursing Home facilities. This operational complexity requires additional administrative resources to track and manage holiday pay accurately, increasing the potential for payroll processing errors. Furthermore, the lack of clarity and the challenges in implementation have

> negatively impacted employee morale, with many expressing confusion and frustration. Efforts to communicate the new rule effectively have been ongoing, but the ambiguity remains a significant hurdle. The potential legal risks and compliance issues arising from these unclear definitions and inconsistent applications have also necessitated seeking legal advice and facing regulatory scrutiny. Compared to previous holiday pay practices, the new rule has introduced a higher level of complexity and administrative burden, underscoring the additional challenges faced by the organization.

(Hejhal Decl. ¶ 12.)

In Bank One, Utah v. Guttau, 190 F.3d 844, 847-48 (8th Cir. 1999), the Eighth Circuit reversed a district court's refusal to grant an injunction where the plaintiff (Bank One) established that state banking statutes were preempted by federal law. The Eighth Circuit noted that, "in the absence of an injunction the continued enforcement of the relevant provisions of the [state law] would result in irreparable economic loss to [plaintiff]," and the court therefore remanded the case back to the district court "for the entry of a permanent injunction." Id. at 850-51.

Here, too, failing to grant Plaintiffs' request for a preliminary injunction will result in irreparable economic losses to Plaintiffs' members. This includes both monetary losses as well as non-economic losses as it relates to defending unfair labor practice charges before the NLRB, grievances under an existing labor contract, and potential private suits by "one or more nursing home workers" under Minn. Stat. § 181.217, subd. 3.

Any harm to Defendant is abstract and purely political in nature. Therefore, the harm to Plaintiffs far outweighs any harm to Defendant. This factor weighs in favor of Plaintiffs.

## III. THE BALANCE OF HARM FAVORS GRANTING PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF.

The Eighth Circuit has previously noted that an injunction of preempted state law by its nature serves the public interest. See e.g., Bank One, N.A. v. Guttau, 190 F.3d 844, 848 (8th Cir. 1999). In such cases, courts need not even consider the factors of balance of harms to the parties and the competing public interests, because those matters are necessarily accounted for by definitively proving a state law to be in violation of the Supremacy Clause of the Constitution. Id. at 848. Nonetheless, these factors also weigh heavily in favor of granting injunctive relief in this case.

The harm to Plaintiffs and the public that may result if injunctive relief is not granted far outweighs any inconvenience to Defendant. Plaintiffs seek only to maintain the pre-January 1, 2025 status quo until the Court can resolve the substantial federal questions presented by the Complaint. See Marigold Foods, Inc. v. Redalen, 834 F. Supp. 1163, 1170 (D. Minn. 1993) (granting preliminary injunctive relief from state regulation to "maintain the status quo until the constitutionality of the Minnesota law can be resolved"); see also Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp., 715 F.3d 1268, 1290 (11th Cir. 2013) ("[T]he public has no interest in the enforcement of . . . an unconstitutional statute").

As detailed above, Plaintiffs and their members will suffer irreparable harm should this Court fail to grant injunctive relief. The harm absent injunctive relief therefore weighs in favor of granting injunctive relief. Moreover, the grant of relief will not cause any

comparable harm. If injunctive relief is granted, the pre-January 1, 2025 status quo will be reestablished and no harm will come as a result of granting injunctive relief.

As a result of the harm to Plaintiffs and their members in the absence of injunctive relief, and the lack of harm to Defendant if such relief is granted, the scale of the equities weighs firmly in favor of granting a temporary restraining order.

## IV. PUBLIC POLICY FAVORS GRANTING THE RELIEF REQUESTED BY PLAINTIFFS.

Finally, public policy also weighs in favor of issuance of injunctive relief. The Court must consider the "strong public interest in deferring to the will of Congress," including its intent to preempt state law. Cellco Partnership v. Hatch, 2004 WL 1447914 at *4 (D. Minn. June 29, 2004). Here, the Holiday Pay Rule authorizes employers to violate the NLRA and, in practice, interferes with the substantive aspects of the bargaining process, which expressly contradicts the text of the NLRA and Congressional policy behind it. "[I]t cannot be said an injunction that compels compliance with [a federal statute] – a congressional mandate, the classic expression of the 'public interest' in a democracy – could disserve the public interest." Illinois Hosp. Ass'n v. Ill. Dep't of Pub. Aid, 576 F. Supp. 360, 371 (N.D. Ill. 1983) (emphasis in original).

As set forth above, the NLRA preempts state regulation of private-sector employers. The public interest in enforcing federal law is compromised if the Holiday Pay Rule is permitted to be enforced.

## CONCLUSION

Injunctive relief is necessary to prevent Defendant from illegally infringing on Plaintiffs' rights and to prevent Defendant from violating the NLRA and the Supremacy

Clause of the Constitution. Plaintiffs respectfully request that the Court immediately enter a preliminary injunction, or in the alternative, a temporary restraining order, enjoining Defendant from implementing and enforcing the Holiday Pay Rule.

Dated: January 27, 2025

**FELHABER LARSON**

By: */s/ Grant T. Collins*

Grant T. Collins, MN #390654
Brandon J. Wheeler, MN #396336
220 South Sixth Street, Suite 2200
Minneapolis, MN 55402-4504
Telephone: (612) 339-6321
Facsimile: (612) 338-0535
gcollins@felhaber.com
bwheeler@felhaber.com

**ATTORNEYS FOR PLAINTIFFS**