## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| LEADINGAGE MINNESOTA and CARE PROVIDERS OF MINNESOTA, | Case No. 24-cv-4282 (LMP/JFD) |
| Plaintiffs, | |
| v. | **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS AND DENYING AS MOOT PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |
| NICOLE BLISSENBACH, *in her official capacity as Commissioner of the Minnesota Department of Labor and Industry*, | |
| Defendant. | |

Brandon J. Wheeler and Grant T. Collins, **Felhaber, Larson, Fenlon & Vogt, PA, Minneapolis, MN**, for Plaintiffs.

Scott A. Grosskreutz and Linnea Constance VanPilsum-Bloom**, Office of the Minnesota Attorney General, St. Paul, MN**, for Defendant.

Plaintiffs LeadingAge Minnesota and Care Providers of Minnesota (collectively "Plaintiffs") brought this action against Nicole Blissenbach, in her official capacity as the Commissioner of the Minnesota Department of Labor and Industry (hereinafter "the Commissioner"). ECF No. 22. Plaintiffs seek a declaratory judgment that a new Minnesota rule mandating that nursing home workers receive holiday pay on certain designated holidays—and allowing their employers to modify some of those holidays—is

preempted by federal law.  *Id.* ¶¶ 51–55.[1]  Plaintiffs also seek a preliminary injunction to enjoin the rule immediately.  ECF Nos. 26, 28.

The Commissioner opposes the preliminary injunction motion and further moves to dismiss.  *See* ECF Nos. 36, 41.  In the motion to dismiss, the Commissioner argues that Plaintiffs lack standing and otherwise do not state a claim that the rule is preempted.  *See generally* ECF No. 33.  Regarding the preliminary injunction, the Commissioner argues that Plaintiffs fail to show that they are likely to succeed and that they are likely to be irreparably harmed.  *See generally* ECF No. 41.

Plaintiffs have standing, so the Court will consider the merits of the motion to dismiss.  Because Plaintiffs' preemption argument fails as a matter of law, the Court grants the Commissioner's Motion to Dismiss.

## BACKGROUND

## I.    The Holiday Pay and Date Flexibility Rules

The Minnesota Nursing Home Workforce Standards Board (the "Board") was established in 2023 as a Minnesota state agency housed within the Minnesota Department of Labor and Industry.  *See* Minn. Stat. §§ 181.211-218.  The Board is made up of nine voting members: the Commissioners of the Department of Human Services, the Department of Health, and the Department of Labor and Industry; three members who represent "nursing home employers or employer organizations"; and three members who

---

[1]    Plaintiffs also alleged, in the amended complaint, that the law is unconstitutionally vague.  ECF No. 22 ¶ 4.  However, Plaintiffs abandoned that claim, and it will be dismissed accordingly.  ECF No. 39 at 2.

represent "nursing home workers or worker organizations." *Id.* § 181.212, subd. 1(a).
Relevant here, "nursing home worker" is defined as "any worker who provides services in
a nursing home in Minnesota, including direct care staff, non-direct care staff, and
contractors, but excluding administrative staff, medical directors, nursing directors,
physicians, and individuals employed by a supplemental nursing services agency";[2] and
"nursing home employer" is "an employer of nursing home workers in a licensed,
Medicaid-certified facility." *Id.* § 181.211, subds. 8–9.

The Board was initially tasked with, among other things, "adopt[ing] rules
establishing minimum nursing home employment standards that are reasonably necessary
and appropriate to protect the health and welfare of nursing home workers," and
"adopt[ing] rules establishing initial standards for wages for nursing home workers." *Id.*
§ 181.213, subd. 1(a)–(b).  Accordingly, on August 26, 2024, the Board published a notice
of intent to adopt, and on December 9, 2024, did adopt, "Expedited Permanent Rules
Modifying Certification Criteria, Notice Posting Requirements, And Holiday Pay Rules
For Nursing Home Workers" (hereinafter the "Rule"), that—in relevant part—requires
nursing home employers to pay time and a half to employees who work on eleven

---

[2]      At argument, Plaintiffs acknowledged that the definition of "nursing home workers"
is broader than what would typically come to mind like personal care attendants and nurses.
Indeed, the Board published a memo on December 10, 2024, which indicated that nursing
home workers include "non-management registered nurses, certified nursing assistants,
trained medication aides, dietary aides, cooks and more."   The memo is found at
https://perma.cc/D3AM-J7T7.

designated holidays.  49 Minn. Reg. 628 (Dec. 9, 2024); Minn. Admin. R. 5200.2010.[3]  The Rule designates a "holiday" as the "24-hour period comprised of the time from midnight of the date designated as a holiday to the next midnight."  Minn. Admin. R. 5200.2000, subp. 4.  The Rule also contains a provision allowing employers to substitute up to four of the designated holidays with other days of the year and to alter the "24-hour period" that comprises the holiday, if a majority of employees agree to such changes.  Minn. Admin. R. 5200.2010, subp. 2 (the "Date Flexibility" provision).

The relevant sections of the Rule provide that:

**5200.2000 DEFINITIONS**

. . .

**Subp. 4. Holiday.** "Holiday" means the following dates: New Year's Day, January 1; Martin Luther King's Birthday, the third Monday in January; Washington's and Lincoln's Birthday, the third Monday in February; Memorial Day, the last Monday in May; Juneteenth, June 19; Independence Day, July 4; Labor Day, the first Monday in September; Indigenous Peoples' Day, the second Monday in October; Veterans Day, November 11; Thanksgiving Day, the fourth Thursday in November; and Christmas Day, December 25.  A holiday is a 24-hour period comprised of the time from midnight of the date designated as a holiday to the next midnight.

. . .

**5200.2010 HOLIDAY PAY.**

**Subp. 1. Holiday pay.** Beginning January 1, 2025, a nursing home worker who works any holiday shall be paid a minimum of time-and-

---

[3]     Section 5200.2000–2010 contains the relevant holiday pay requirements, whereas sections 5200.2020–2050—technically part of the same rule—deal with other matters related to nursing home workers and employers.  The Rule can be found at: https://perma.cc/ZSR5-V4DR.

4

one-half their regular hourly wage for all hours worked during the holiday.

**Subp. 2. Modification of holiday date and time.**

A. The start and stop times for the 24-hour period comprising a holiday can be modified by a nursing home employer if agreed upon by a majority of affected nursing home workers or the exclusive representative of the affected nursing home workers if one exists.

B. A nursing home employer may substitute up to four holidays for an alternate day in the same calendar year if the substitution is agreed upon by a majority of affected nursing home workers or the exclusive representative of the affected nursing home workers if one exists.

C. Any agreement to modify a holiday date or time must be made in the calendar year preceding the start of the calendar year in which the modified holiday is observed. There must be written record of an agreement under this item.

D. The nursing home employer must retain a record of agreement to modify a holiday date or time under item C for a minimum of three years following the observation of the modified holiday.

Minn. Admin. R. 5200.2000–2010.

On December 10, 2024, the Board published a memo on its website for nursing home employers titled "How to, holiday pay rules."[4] The memo explains that though "[n]ursing homes do not need to alter the list of holidays to meet the standards . . . the rules are drafted understanding some facilities may want an altered list of dates and times based on employee and business needs." Accordingly, "the rules were drafted to give flexibility to facilities in how they determine which holidays should be observed." As guidance on how to alter up to four of the eleven covered holidays or the 24-hour period of a given

---

[4]     The memo is found at https://perma.cc/D3AM-J7T7.

holiday, the memo notes that nursing home facilities with an "exclusive representative, such as a union, the facility's management and union can come to an agreement in the manner [they] usually used [to] change a condition of a contract." For facilities without a representative, "management would need to either hold a vote, circulate a petition or in some other way obtain and record support from a majority of employees." This could come in the form of "a meeting with a vote at the end, a survey, a petition in the break room or any other reasonable way for workers to let their voices be heard." But the memo explains that it is exemplary only, and that "[a] facility might use a different process than those listed."

## II.    Plaintiffs' Complaint and Motion for Preliminary Injunction

Plaintiffs brought this action on November 26, 2024, and filed an amended complaint on January 8, 2025. ECF Nos. 1, 22. The amended complaint asserts that the Rule is: (1) preempted by the National Labor Relations Act ("NLRA"); and (2) unconstitutionally vague and contradictory. ECF No. 22 ¶¶ 2–4.

Plaintiffs describe themselves as "non-profit corporation[s]" who are "association[s] of over 1,000 member organizations across Minnesota, representing organizations providing services along the full spectrum of post-acute care and long-term services and support, including what are commonly referred to as 'nursing homes.'" *Id.* ¶¶ 6–7. Plaintiffs do not claim direct harm from the Rule but instead assert that their members are directly harmed by the Rule. *Id.* ¶¶ 41–50. Specifically, Plaintiffs allege that their members are harmed because (1) they are "forced to choose between complying with an unlawful and preempted Rule, or violating the NLRA"; (2) they are required to pay

6

employees time and a half rates for days and hours they did not previously pay time and a half; and (3) they cannot discern "which employees are entitled to holiday pay under the Rule, and which are not, which has forced some of Plaintiffs' members to provide holiday pay to a wider class of employees than" necessary. *Id.* ¶¶ 46–48. Further, Plaintiffs allege that "at least one of Plaintiffs' members has been threatened with a lawsuit, grievances, and/or administrative charges." *Id.* ¶ 50.

On January 27, 2025, Plaintiffs sought a temporary restraining order, or, in the alternative, a motion for a preliminary injunction, asking the Court to immediately enjoin the Rule, ECF No. 26, and arguing that they are likely to succeed on their preemption argument and that their members are irreparably harmed by the Rule, ECF No. 28 at 1–2.[5] In support, Plaintiffs attached declarations of Angela Brown, Roxanne Hejhal, Annette Greely, and Katie Davis. ECF Nos. 29-1, 29-2, 29-3, 40-1, respectively.[6] All identify as officers of non-profit organizations that operate residential facilities across Minnesota, some of which are classified as "nursing homes" under Minn. Stat. § 181.211, subd. 7. ECF No. 29-1 at 2; ECF No. 29-2 at 2–3; ECF No. 29-3 at 2, ECF No. 40-1 at 2. They explain that their organizations' nursing homes are often located on "hybrid" campuses, meaning that those campuses contain both nursing homes and living facilities that are not

---

[5]     Plaintiffs filed an earlier preliminary injunction motion on December 10, 2024, after they filed their original complaint. ECF No. 6. The Court denied that motion as moot after Plaintiffs filed their amended complaint on January 8, 2025. ECF No. 23.

[6]     The first three declarations were submitted on January 27, 2025, along with the Plaintiffs' preliminary injunction motion. The final declaration was submitted on February 12, 2025, along with Plaintiffs' response to the Commissioner's motion to dismiss.

classified as nursing homes.  ECF No. 29-1 at 2–3; ECF No. 29-2 at 3, ECF No. 29-3 at 2, ECF No. 40-1 at 2–3.  On these hybrid campuses, many employees perform work throughout the various facilities, and the organizations often "do not distinguish between employees who work in Nursing Homes and employees who perform work in non-Nursing Home facilities."  ECF No. 29-1 at 2–3; ECF No. 29-2 at 3, ECF No. 40-1 at 3.  The Rule therefore has required "additional administrative resources to track and manage holiday pay accurately."  ECF No. 29-2 at 5.

Additionally, three of the organizations employ union and non-union employees, while one employs only non-union employees.  ECF No. 29-1 at 3; ECF No. 29-2 at 3; ECF No. 29-3 at 2; ECF No. 40-1 at 3.  For the non-union employees, the organizations voluntarily recognized six or seven holidays and paid either double time or time and a half on those, but, because of the Rule, they are now required to pay time and a half for the additional new holidays.  ECF No. 29-1 at 3–4; ECF No. 29-2 at 4, ECF No. 29-3 at 2, ECF No. 40-1 at 3.  With regard to union employees, one organization took the stance that its collective bargaining agreements "preempt" the Rule and has since been threatened with grievances from the unions for disregarding the Rule.  ECF No. 29-1 at 3–4.  Two organizations, on the other hand, added holidays to those already agreed to in its collective bargaining agreements.  ECF No. 29-2 at 4, ECF No. 40-1 at 4.  All in all, Brown estimates that compliance with the Rule will cost her organization $700,000 per year.  ECF No. 29-1 at 4. Hejhal estimates that compliance will cost her organization almost $546,000 per year.  ECF No. 29-2 at 6.  Greely estimates that compliance will cost her organization

$54,000 per year.  ECF No. 29-3 at 2.  Davis estimates that compliance will cost her organization $255,000 per year.  ECF No. 40-1 at 4.

The Commissioner moved to dismiss Plaintiffs' amended complaint.  ECF No. 36. She argues that Plaintiffs lack standing because they fail "to identify any of its nursing home members or a particular and concrete harm faced by its members," ECF No. 33 at 5, and that Plaintiffs otherwise fail to state a claim because the Rule is not preempted by the NLRA, *id.* at 8.  The Commissioner alternatively urges the Court to deny Plaintiffs' motion for a preliminary injunction, arguing that Plaintiffs are unlikely to succeed on the merits of their claims and are not irreparably harmed.  ECF No. 41 at 1–2.

On February 19, 2025, the day before a hearing on both motions, Plaintiffs submitted one final declaration along with a reply brief in support of their motion for a preliminary injunction.  ECF No. 48.  This declaration came from Mark Schulz, an executive of LeadingAge Minnesota, who declared that he is "familiar with the organizations that are members" of Plaintiff associations LeadingAge and Care Providers, and that each of the four nursing-home organizations identified in the declarations of Brown, Hejhal, Greely, and Davis are members of one of the Plaintiff associations.  *Id.*

## DISCUSSION

The Commissioner's motion to dismiss first asserts that Plaintiffs lack standing.  *See generally* ECF No. 33.  Because "[s]tanding is an essential and unchanging part of the case-or-controversy requirement," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), the Court "has no subject-matter jurisdiction" to entertain any part of a case when a plaintiff lacks standing, *ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 958 (8th Cir.

2011).  Accordingly, "standing must be decided first."  *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 601 (8th Cir. 2022) (citation omitted).

# I.    Associational Standing

"Federal court jurisdiction is restricted to cases and controversies," *Missouri v. Yellen*, 39 F.4th 1063, 1067 (8th Cir. 2022) (citation omitted) (internal quotation marks omitted), and "[s]tanding to sue is a doctrine rooted in the traditional understanding of a case or controversy," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  To meet the "irreducible constitutional minimum" required to establish standing, a plaintiff has the burden to show three elements: (1) the plaintiff suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.  *Id.*  "The party invoking federal jurisdiction bears the burden of establishing standing."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted) (internal quotation marks omitted).  When assessing standing at the preliminary injunction stage, this Court assumes the complaint's allegations are true and views them in the light most favorable to the plaintiff.  *Dakotans for Health v. Noem*, 52 F.4th 381, 386 (8th Cir. 2022) (citing *Jones v. Jegley*, 947 F.3d 1100, 1103 (8th Cir. 2020) and *Rodgers v. Bryant*, 942 F.3d 451, 454 (8th Cir. 2019)).

Here, Plaintiffs advance a theory of associational standing.  ECF No. 22 ¶¶ 41–50.  Associational standing requires an organization to demonstrate "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Students for*

*Fair Admissions, Inc. v. Pres. & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). This test "guarantees the satisfaction" of the standing requirement "by requiring an organization suing as representative to include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996).

Further, an association must come forward and "'identify members who have suffered the requisite harm.'" *Religious Sisters of Mercy*, 55 F.4th at 602 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)). And an association may not rely on "self-descriptions of their membership," *id.*, but must "submit affidavits or other evidence showing, through specific facts . . . that one or more of [its] members would thereby be 'directly' affected," *Lujan*, 504 U.S. at 563 (citing *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972).

Plaintiffs submitted declarations of four individuals with their preliminary injunction motion and in opposition to the Commissioner's motion to dismiss. *See, e.g.*, ECF Nos. 29-1–29-3, 40-1. These individuals represent four different nursing-home organizations and explain precisely how the Rule does, and will continue to, affect their operations, most notably by requiring the organizations to pay substantially more in employee wages than they previously did. As such, they are the sort of "affidavits or other evidence" that show "through specific facts" how an associational member is adversely affected by the Rule. *Lujan*, 504 U.S. at 563.

11

The Commissioner argues that because the amended complaint did not name specific member organizations, Plaintiffs failed to identify affected members. ECF No. 33 at 5–7. In essence, the Commissioner asks the Court to disregard the declarations because they were not submitted with the amended complaint and the amended complaint itself did not name the subsequently identified nursing home organizations. ECF No. 46 at 2–3 (citing *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993)).

The Commissioner is correct that the amended complaint does not, by itself, identify any members of either of Plaintiffs' organizations. But the amended complaint contains detailed assertions about how Plaintiffs' "members" are adversely affected by the Rule. ECF No. 22 ¶¶ 41–50. Thus, the question presented by the Commissioner is whether the amended complaint must do something more than that and identify at least one member *by name* within its four corners. The Court thinks not. As long as the members are specifically identified through another means, the Court is satisfied. *Worth v. Jacobsen*, 108 F.4th 677 (8th Cir. 2024), is instructive. There, three gun-rights associations and three named members—Kristin Worth, Austin Dye, and Alex Anderson—sought to challenge a Minnesota permit-to-carry statute that required applicants to be at least 21 years old. *Id.* at 683. The associations established associational standing in the district court "by and through" their assertions that those three specific individuals were members. *Id.* at 685. However, by the time of the appeal, the three individual members had lost individual standing because they had all turned at least 21 years old. *Id.* And because the associations had not specifically identified any other member in the process of the litigation, they too lost standing. *Id.* But to avoid the dismissal of their appeal, the associations moved to

supplement the record "with the affidavit of Joe Knudsen—a 19-year-old Minnesotan seeking a permit-to-carry, who is a member of all three organizations." *Id.* The Eighth Circuit accepted the affidavit and, through it alone, held that "the organizational plaintiffs have demonstrated that at least one of their members has had continuous standing." *Id.*

Given that the Eighth Circuit accepted as sufficient a member affidavit for the first time on appeal, it is difficult to see why affidavits submitted in response to a motion to dismiss would not similarly suffice. At minimum, *Worth* highlights that although an association must identify specific members to establish associational standing, it does not necessarily have to do so in the complaint. And such an interpretation is a natural result of the well-established principle that "the district court has authority to consider matters outside the pleadings when subject matter jurisdiction is challenged under Rule 12(b)(1)." *Osborn v. United States*, 918 F.2d 724, 728 n.4 (8th Cir. 1990); *see also Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 41 (D.D.C. 2011) (citation omitted) (emphasis added) (explaining that a "court may consider such materials outside the pleadings *as it deems appropriate* to resolve the question whether it has jurisdiction in the case"). Accordingly, the Court accepts the Plaintiffs' declarations as evidence of associational standing.

The Commissioner alternatively argues that, even if the Court accepts the declarations, "none of the declarants identifies themselves or their facilities as being members of either Plaintiff organization." ECF No. 46 at 3. The Commissioner is, again, correct. But the Plaintiffs did submit one final declaration, the Schulz Declaration, that

claimed them all as members.[7]  And Plaintiffs, throughout their briefing, repeatedly observe that the nursing home facilities of all four declarants are members.  *See, e.g.*, ECF No. 28 at 5 (noting that the Rule impacts "Plaintiffs' members" and citing to the attached declarations), *id.* at 7 (arguing that "Plaintiffs' members" suffer monetary harm and citing to the attached declarations).  The Court will again credit the Schulz Declaration as acceptable evidence and credit Plaintiffs' representations that the organizations are members.

Admittedly, the manner in which Plaintiffs sought to establish associational standing was haphazard.  It would have been much simpler to name and identify specific members upfront in the amended complaint.  But the Court is assured that the Plaintiffs do have members affected by the Rule.  That is enough.  And because the Commissioner limits her standing challenge to the procedural deficiencies outlined above, ECF No. 46 at 2 (only arguing that the affidavits are procedurally insufficient), and does not argue that Plaintiffs otherwise lack Article III standing, the Court denies the Commissioner's motion to dismiss on standing grounds and turns to the merits at the heart of Plaintiffs' amended complaint.

## II.    Plaintiffs Fail to State a Claim of NLRA Preemption

The Commissioner also argues that the Court should dismiss the amended complaint because it fails to state a claim as a matter of law.  ECF No. 33 at 8–21.

---

[7]    The Court notes that the Commissioner did not have the chance to respond to this final declaration in writing, as it was submitted the day before the hearing. But at argument, the Commissioner appeared to concede that the Plaintiffs' eleventh-hour submission was enough to confer standing.

Ordinarily, a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) attacks a complaint's factual plausibility; that is, whether a plaintiff has pleaded sufficient facts to support a legally cognizable claim. But Rule 12(b)(6) motions may also attack a complaint for failure to assert a legally cognizable theory in the first place. *See Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."). Such is the case here. The Commissioner's motion asserts that Plaintiffs' preemption argument is legally meritless. *See* ECF No. 33 at 8–21. In this situation, the Court accepts as true all of the factual allegations in the amended complaint and draws all reasonable inferences in Plaintiffs' favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted). The complaint must be dismissed if the theory of liability pleaded is not "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (citation omitted).

Plaintiffs claim that the Rule is preempted by the NLRA. *See* ECF No. 22 ¶¶ 52–53. In general, the NLRA—codified at 29 U.S.C. §§ 151–69—governs labor-management relations in the private sector and "'encourag[es] the practice and procedure of collective bargaining' between labor and management to resolve 'industrial disputes arising out of differences as to wages, hours, or other working conditions.'" *Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771, 775 (2023) (alteration in original) (quoting 29 U.S.C. § 151). Generally, Section 7 of the NLRA "protects employees in their right to choose whether or not to (1) organize, form, join, or assist a labor union; (2) collectively bargain; and (3) engage in concerted activity for mutual aid or protection." Stephen F. Befort & Bryan N. Smith, *At the Cutting Edge of Labor Law Preemption: A*

*Critique of* Chamber of Commerce v. Lockyer, 20 Lab. Law. 107, 111 (2004) (citing 29 U.S.C. § 157). Section 8, on the other hand, "bans conduct that interferes with employees' rights to organize, bargain collectively, or engage in protected concerted activities." *Id.* (citing 29 U.S.C. § 158(a)). Relevant here, Section 8(a)(2) specifically forbids employers from "dominat[ing] or interfer[ing] with the formation or administration of any labor organization." 29 U.S.C. § 158(a)(2).

Although the NLRA "contains no express pre-emption provision," *Chamber of Com. of U.S. v. Brown*, 554 U.S. 60, 65 (2008), "[i]t is a bedrock rule . . . that federal law preempts state law when the two conflict." *Glacier Nw.*, 598 U.S. at 776 (citing U.S. Const., art. VI, cl. 2). And the United States Supreme Court has developed "two distinct doctrines, which are commonly referred to as *Garmon* and *Machinists* preemption." *Williams v. Watkins Motor Lines, Inc.*, 310 F.3d 1070, 1072 (8th Cir. 2002) (citing *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959) and *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Emp. Rels. Comm'n*, 427 U.S. 132 (1976)).

*Garmon* preemption "is intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of . . . the NLRA" and therefore "forbids States to 'regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits.'" *Idaho Bldg. & Constr. Trades Council, AFL-CIO v. Inland Pac. Chapter of Associated Builders & Contractors, Inc.*, 801 F.3d 950, 956 (9th Cir. 2015) (citations omitted) (internal quotation marks omitted). "The core of the *Garmon* preemption . . . lies in the goal of preserving the Board's primary jurisdiction to interpret and administer the NLRA." *At the Cutting Edge*, 20 Lab. Law. at 111. Accordingly,

16

"*Garmon* provides that, '[w]hen it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the [NLRA], or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield.'" *Idaho Bldg. & Constr. Trades Council*, 801 F.3d at 956 (alterations in original) (quoting *Garmon*, 359 U.S. at 244); *see also At the Cutting Edge*, 20 Lab. Law. 107, 112 (explaining that a State may not "adopt regulations or assert state court jurisdiction pertaining to conduct that arguably falls into" one of Section 7's employee protection categories or adopt "regulations or assert[] state court jurisdiction as to conduct that arguably constitutes an unfair labor practice under section 8").  Ultimately, *Garmon* prohibits States from "setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, [and] also from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the Act." *Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould*, 475 U.S. 282, 286 (1986).

*Machinists* preemption, on the other hand, forbids both the National Labor Relations Board (NLRB) and States to regulate conduct that Congress intended "be unregulated" and "left 'to be controlled by the free play of economic forces.'" *Chamber of Com. of U.S*, 554 U.S. at 65 (quoting *Machinists*, 427 U.S. at 140).  *Machinists* is rooted in the recognition that "important reasons exist for leaving an area unregulated despite Congress' silence on the matter," and accordingly "finds its roots in the theory of field occupation." *At the Cutting Edge*, 20 Lab. Law. at 113. In essence, *Machinists* forbids "state interference with policies implicated by the structure of the [NLRA] itself," *Metro. Life Ins. v. Massachusetts*, 471 U.S. 724, 749 (1985), and "protects the collective bargaining process

itself from interference," *Thunderbird Mining Co. v. Ventura,* 138 F. Supp. 2d 1193, 1196 (D. Minn. 2001). But because "[t]he NLRA is concerned primarily with establishing an equitable process for determining terms and conditions of employment," *Metro. Life*, 471 U.S. at 753, a "state law is not preempted by the NLRA merely because it regulates a mandatory subject of bargaining," *520 S. Mich. Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1128 (7th Cir. 2008).

In essence, *Garmon* preemption centers on conduct the federal government already regulates while *Machinists* preemption applies to areas Congress chose not to regulate, recognizing the importance of collective bargaining and market forces. Plaintiffs argue that the Rule is invalid under either a *Garmon* or *Machinists* theory. ECF No. 28 at 13.

### A. The Rule is not preempted under *Garmon* because the Rule does not allow an employer to violate the NLRA.

Any *Garmon* analysis must first ask what specific provisions of the NLRA are allegedly violated. *See Healthcare Ass'n of N.Y. State, Inc. v. Pataki*, 471 F.3d 87, 96 (2d Cir. 2006) ("We must therefore begin by identifying whether any specific provision of sections 7 or 8 of the NLRA actually or arguably prohibits or protects the conduct that is the subject of state regulation."). Plaintiffs argue that the Rule runs afoul of Section 8(a)(2)'s prohibition against employer actions that "dominate or interfere with the formation or administration of any labor organization," because it allows an employer to dictate certain aspects of the employee decision-making process. ECF No. 39 at 16–25. Alternatively, Plaintiffs argue that the Rule allows an employer to violate Section 7's grant of rights to employees "to refrain from" such activities as self-organizing, forming, joining,

or assisting a union, and "bargain[ing] collectively through representatives of their own choosing." *Id.* at 14–16 (quoting 29 U.S.C. § 157); *see also Brown v. Pro Football, Inc.*, 50 F.3d 1041, 1052 (D.C. Cir. 1995) ("Under the NLRA, employees have an equal right to join or refrain from joining unions and engaging in collective bargaining.").

Plaintiffs argue that the Rule sanctions an employer to violate the NLRA, and therefore *Garmon*'s preemption against laws "setting forth standards of conduct inconsistent with the substantive requirements of the NLRA." *Gould*, 475 U.S. at 286. To determine whether they are correct, the Court must "assess the activity to determine whether it is 'arguably' likely to be protected or prohibited under the NLRA." *Nat'l Ass'n of Mfrs. v. Perez*, 103 F. Supp. 3d 7, 22 (D.D.C. 2015) (citing *UAW–Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 363–65 (D.C. Cir. 2003)). To do so, "the party claiming pre-emption is required to demonstrate that his case is one that the Board could legally decide in his favor. That is, a party asserting pre-emption must advance an interpretation of the [NLRA] that is not plainly contrary to its language and that has not been 'authoritatively rejected' by the courts or the Board." *Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*, 476 U.S. 380, 395 (1986) (quoting *Marine Eng'rs v. Interlake S.S. Co.*, 370 U.S. 173, 184 (1962)). And "[b]ecause *Garmon* preemption turns on what the NLRA actually or arguably requires (or prohibits)," the Court looks "principally to the decisions of the NLRB to decide whether *Garmon* preemption applies." *Idaho Bldg. & Const. Trades Council*, 801 F.3d at 962. "If the NLRB, however, has not decided whether a specific activity falls within those sections, the court must assess the activity to determine whether it is 'arguably' likely

19

to be protected or prohibited under the NLRA." *Perez*, 103 F. Supp. 3d at 22 (D.D.C. 2015) (citation omitted).

### i.    Section 8(a)(2) Violation

Plaintiffs argue that the Rule's Date Flexibility provision "authorizes employers to violate" Section 8(a)(2) because it permits employers to "dominate" the potential voting process employees would undertake when presented with an employer's proposed holiday alteration.  ECF No. 39 at 16–25.

Section 8(a)(2) makes it unlawful for an employer to "dominate or interfere with the formation or administration of any labor organization."  29 U.S.C. § 158(a)(2).  To determine whether an employer's action violates Section 8(a)(2), the NLRB first considers whether the body of employees allegedly dominated constitutes a "labor organization," and only then considers whether the employer dominated or interfered with the alleged organization.  *Electromation, Inc. v. NLRB*, 35 F.3d 1148, 1157–58 (7th Cir. 1994).  Here, Plaintiffs' argument that the Date Flexibility provision sanctions the violation of Section 8(a)(2) is unsuccessful because the Date Flexibility provision does not require or create, nor instruct an employer to create, a "labor organization."

The NLRA defines labor organization as "any organization of any kind . . . in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."  29 U.S.C. § 152(5); *see also T-Mobile USA, Inc. v. NLRB*, 90 F.4th 564, 571 (D.C. Cir. 2024) ("A group therefore qualifies as a labor organization if employees participate; the group exists, at least in part, for the purpose of

"dealing with" the employer; and those dealings concern the subjects listed in Section [152(5)].").

First, it is not clear that the Rule creates or instructs an employer to create an "organization of any kind . . . in which employees participate." 29 U.S.C. § 152(5). The Rule allows an employer who wishes to alter holiday dates or times to determine which employees constitute "nursing home workers," and then seek the approval of a majority of those employees. Minn. Admin. R. 5200.2010, subp. 2. Thus, the Rule does not contemplate or require anything other than the agreement of a majority of affected employees; those employees in turn need not form *any* sort of organization to express that agreement. And although it is true that the NLRB has explained that a labor organization may exist "even if it lacks a formal structure, has no elected officers, constitution or bylaws, does not meet regularly, and does not require the payment of initiation fees or dues," *T-Mobile USA*, 90 F.4th at 572 (citation omitted), such an attenuated structure is unlikely to be a labor organization. Indeed, in *Electromation*, the NLRB found a labor organization existed in various formally constituted "Action Committees," which were made up of "six hourly employees and one or two management personnel" and "were scheduled to meet on a weekly basis." 309 N.L.R.B. 990, 1017 (1992). Likewise, in *NLRB v. Cabot Carbon Co.*, 360 U.S. 203, 204 (1959), "employee committees" which were established by management and created "for the stated purposes of meeting regularly with management to consider and discuss problems of mutual interest, including grievances, and of handling 'grievances at nonunion plants and departments,'" were labor organizations. The same can be said of *Ona Corp.*, 285 NLRB 400, 402 (1987), in which management created an

"Employee Action Committee" made up of 12 employees tasked with meeting regularly and discussing areas of improvement directly with management.

The Rule creates no structure similar to these "action committees" and "employee committees," and the Court has found no support for the proposition that merely asking employees to vote on some limited employment-related matters transforms those employees into a labor organization. If that were the case, then a vote among employees about from where to order lunch would transform the workforce into a labor organization.

Nevertheless, even if the class of "affected nursing home workers" constitutes a labor organization, that organization would not "deal with" nursing home employers. Although the NLRA does not precisely define what constitutes "dealing," it is broader than "bargaining with." *Cabot Carbon Co.*, 360 U.S. at 211. Even so, the NLRB defines "dealing" as requiring some sort of "bilateral mechanism" between employees and an employer, with "a pattern or practice in which a group of employees, over time, makes proposals to management, management responds to these proposals by acceptance or rejection by word or deed, and compromise is not required." *E.I. Du Pont De Nemours & Co.*, 311 NLRB 893, 894 (1993). When "there are only isolated instances in which the group makes ad hoc proposals to management followed by a management response of acceptance or rejection by word or deed, the element of dealing is missing." *Id.* at 894. Further, "[a] unilateral mechanism, such as a 'suggestion box,' or 'brainstorming' groups or meetings, or analogous information exchanges, does not constitute 'dealing with.'" *Electromation, Inc.*, 309 N.L.R.B. at 995 n.21.

One court surmised four general principles from the NLRB's jurisprudence on "dealing":

> (1) while the term "dealing with" connotes activity which is broader than collective bargaining, an employer does not necessarily "deal with" its employees merely by communicating with them, even if the matters addressed concern working conditions; (2) "dealing" occurs only if there is a "pattern or practice" over time of employee proposals concerning working conditions, coupled with management consideration thereof; (3) isolated instances of the conduct described in number two do not constitute "dealing;" and (4) management may, in certain circumstances, gather information from employees about working conditions and may even act on that information without necessarily "dealing with" them.

*NLRB v. Peninsula Gen. Hosp. Med. Ctr.*, 36 F.3d 1262, 1271–72 (4th Cir. 1994).

The Date Flexibility provision here does not require or contemplate "dealing." In fact, employers and employees are not required to do anything. The provision allows an employer to modify up to four holiday dates or times "if agreed upon by a majority of affected nursing home workers," specifies that any agreement be made "in the calendar year preceding the start of the calendar year in which the modified holiday is observed," and requires that the employer keep a record of said agreement for three years. Minn. Admin. R 5200.2010, subp. 2. The provision clearly does not promote "bilateral" discussions, nor does it envision or require a "pattern or practice" of employee-initiated proposals. *E.I. Du Pont De Nemours & Co.*, 311 N.L.R.B. at 894. And while the provision contemplates *employer*-initiated communication with employees, this does not constitute anything more than a "unilateral mechanism" pursuant to which an employer and an employee might exchange information. *Electromation, Inc.*, 309 N.L.R.B. at 995 n.21. Further, that the process might "take place each year," ECF No. 39 at 19, is nothing more

23

than the sort of "isolated instance[]" that does not raise the purported group's primary purpose to one of "dealing with" the employer, *E.I. Du Pont De Nemours & Co*., 311 N.L.R.B. at 894.

Each case cited by the Plaintiffs to support their argument that the "majority of affected nursing home workers" will "deal with" their employers considered—at minimum—groups of employees that presented *employee*-initiated proposals to management and subsequently negotiated extensively over those proposals. *See, e.g.*, *Ona Corp*., 285 N.L.R.B. at 405 ("The necessary interchange between the parties is further demonstrated by the fact there were discussions between the Employee Action Committee, the advisory committee, and the plant staff committee about the vacation scheduling proposal that the Employee Action Committee made to management."); *St. Vincent's Hosp*., 244 NLRB 84, 85–86 (1979) (council made up of employees and management discussed 25 different topics related to employee grievances at monthly meetings); *Ampex Corp*., 168 NLRB 742, 746 (1967) (noting that "the real purpose of The Committee is to present suggestions to the Company on behalf of all the employees upon subjects pertaining to conditions of work" and noting "but a few of the many instances where The Committee and the Company discussed matters traditionally raised at bargaining sessions between labor and management"). Simply put, the Rule here does not contemplate anything remotely similar to the sustained and specific purposes of previously recognized "labor organizations." Accordingly, because the Rule does not authorize or sanction the creation of a "labor organization," the Rule does not relate to conduct encompassed by Section 8(a)(2). The Rule does not run afoul of *Garmon* on this ground.

### ii.    Section 7 Violation

Plaintiffs alternatively argue that the Date Flexibility provision sanctions the violation of an employee's Section 7 right to refrain from engaging in collective bargaining. ECF No. 39 at 14.  They argue that the provision, in allowing for an employer to modify dates or times of holidays only upon the agreement of a majority of workers, strips an individual employee of "their Section 7 rights . . . because the individual employee has a decision foisted upon the employee by the 'majority' that the individual employee has not authorized to be its exclusive bargaining representative through the representation procedures established by the NLRB."  ECF No. 47 at 3.

First, it is not clear that Plaintiffs can assert such a preemption argument.  Plaintiffs represent employers, and Section 7 confers rights on *employees*.    Well-established "[p]rudential limitations on standing require that parties assert their own rights rather than rely on the rights or interests of third parties."  *Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 488 (9th Cir. 1996) (citation omitted) (internal quotation marks omitted).  Consequently, some courts have refused to entertain Section 7 preemption arguments made by employers. *See, e.g.*, *Viceroy Gold Corp*, 75 F.3d at 489 ("[Employer] does not have standing to assert the NLRA rights of its employees."); *Healthcare Ass'n of N.Y. State, Inc.*, 471 F.3d at 96 (refusing to consider Section 7 preemption argument because "[t]he associations have no valid claim that [state law] affects their rights under section 7, since section 7 only confers rights on employees, not on employers").  *But see St. Thomas–St. John Hotel & Tourism Ass'n, Inc. v. Gov't of U.S. Virgin Islands*, 218 F.3d 232, 241 (3d Cir. 2000) (considering Section 7 preemption argument brought by employers and noting that "[w]e know of no

25

governing authority to the effect that the federal statutory provision which allegedly preempts enforcement of local legislation by conflict must confer a right on the party that argues in favor of preemption").

Regardless, for much the same reason that the Date Flexibility provision does not sanction a violation of Section 8(a)(2), it does not sanction a violation of Section 7. Namely: the provision does not contemplate bargaining. As noted above, even if the informal "majority of affected nursing home workers" constitutes some sort of organizational body, the provision does not authorize that informal body to "deal" with employers. Thus, an employee not in the majority has not been stripped of her right to refrain from collective bargaining, nor of her right to choose her own representatives to collectively bargain. That is because no bargaining takes place.

### iii.    Plaintiffs' Reliance on the "Arguable Standard" is Misplaced.

Finally, the Court addresses Plaintiffs' argument that the "arguable" standard requires the Court to find preemption here. ECF No. 47 at 1–2. Plaintiffs essentially assert that although the Rule may not on its face require or sanction an employer to violate the NLRA, the Rule is nevertheless preempted because a future employer might violate Section 8(a)(2) or Section 7 in implementing the Rule, and therefore the entire Rule must be preempted from the start.

It is true that *Garmon* preemption "forbids States to regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits." *Idaho Bldg. & Const. Trades Council*, 801 F.3d at 956 (quotation omitted). But that is a standard of deference that a Court must provide to the NLRB when a *given factual scenario* presents a close call, such

26

that the NLRB might consider the same factual scenario and rule in an employee's favor. It is not, as Plaintiffs contend, a *carte blanche* invitation for a court to invent hypothetical and unrealized future violations by an employer and use those hypothetical violations to find an otherwise valid state law preempted.[8]

In other words, the Court need not strike down a state regulation that does not, by its terms, require or authorize an employer to violate the NLRA, simply because an employer might violate the NLRA independently.  The First Circuit Court of Appeals has rejected a similar argument.  There, the court considered a Rhode Island ordinance that required that "[i]n the event of a change in the identity of the employer at a hospitality business, the new employer . . . shall retain for at least three (3) months . . . those employees who were employed for at least two (2) months preceding the date on which the previous hospitality business employer's status as employer terminated."  *R.I. Hosp. Ass'n v. City of Providence ex rel. Lombardi*, 667 F.3d 17, 24 (1st Cir. 2011).  The ordinance provided three exceptions: (1) where the new employer determined it needed fewer employees; (2) good-cause terminations; and (3) where an employee could not abide by the employer's new terms and conditions of employment.  *Id.*

Employer associations in Rhode Island argued first that the ordinance was preempted under *Garmon* because it "regulates a mandatory subject of bargaining, it

---

[8]    This Court notes that only three of the eleven designated holidays for time-and-one-half holiday pay have come to pass this calendar year.  Moreover, any modifications under the Date Flexibility provision would not go into effect until calendar year 2026.  As such, other than the Rule on its face, the Court is not presented with any scenarios touching on *Garmon* preemption and declines the invitation to do so.

interferes with conduct protected by the NLRA and is thus pre-empted." *Id.* at 37. The court rejected that argument, holding that "[b]ecause the NLRA does not itself protect an employer's ability to hire or fire, and indeed regulates it, such conduct is not arguably protected or arguably prohibited." *Id.* at 38.

Second, and important here, the employer associations raised several other claims that the Ordinance runs afoul of *Garmon*, such as that "the Ordinance somehow restricts the ability of employees to choose their bargaining representative, in violation of Section 7 of the NLRA." *Id.* But the court rejected the associations' "bald assertion" because they failed to "explain how the Ordinance, *which by its terms has no such effect*, imposes such a restriction." *Id.* (emphasis added). Accordingly, the court refused to entertain such a hypothetical situation when it was not mandated by the ordinance itself and noted that "such pre-emption claims can be made by appropriate plaintiffs if and when they materialize." *Id.* at 39. The same is true here. Plaintiffs argue that because a future employer might violate the NLRA in following the Rule, the Rule "sanctions" that violation. But the Rule itself does not require nor sanction such violations by its terms.

The Court is further persuaded by considering cases in which state regulation was preempted by *Garmon*. Particularly instructive is *Goody's Fam. Clothing, Inc.*, Case 10-CA-26718, 1993 WL 726790 (Sept. 21, 1993), a decision consistently cited by Plaintiffs. Although only an NLRB advisory opinion, the Court considers it a prime example of state regulation that "by its terms" requires an employer to violate Section 8(a)(2). *R.I. Hosp. Ass'n*, 667 F.3d 17 at 38. There, the State of Tennessee enacted a law:

which mandates that those employers in the State with poor safety records form safety committees composed of an equal number of employer and employee representatives.  With regard to the employee members, the law provides that, where a collective bargaining relationship exists, employee representatives "may be selected by their peers."  The law contains specific guidelines governing the operation of the committee, including its composition, when it must meet, what areas it must address, and how the employer must interact with it.  It provides, inter alia, that the committee evaluate employee safety suggestions and make recommendations to the employer, and that the employer respond in writing within 30 days or less to committee recommendations.

*Goody's Fam. Clothing, Inc.*, 1993 WL 726790, at *1.

The NLRB opined that the law itself directly conflicted with Section 8(a)(2) because it "requires that employers set up safety committees which clearly are 'labor organizations,'" and "requires that the committees be set up in such a way that they are inevitably dominated by employers within the meaning of Section 8(a)(2)—i.e., employers create the committees, determine their structure and procedures, set their agendas in accordance with the law, pay employees to attend meetings, and even determine which employees will serve on the committees." *Id.* at *5.

Likewise, in *Idaho Building*, Idaho passed a law that by its terms "banned 'job targeting' or 'market recovery' programs" often used by unions to "increase their members' access to work and stem the long-term decline in the percentage of construction workers represented by unions." *Idaho Bldg. & Constr. Trades Council*, 801 F.3d at 954.  But the Ninth Circuit found clear *Garmon* preemption because the NLRB "has repeatedly held that job targeting programs are actually protected under § 7 of the NLRA." *Id.* at 957

29

(collecting cases).  Thus, the law "by its terms" violated the NLRA.  *R.I. Hosp. Ass'n*, 667 F.3d at 38.

There is no similar state mandate here.  The Date Flexibility provision, on its face, does not require an employer to create a bargaining unit.  It does not dictate that employees engage in any dealing.  And it does not outlaw or encourage traditional self-help tools employees might utilize.  It is nothing more than a recognition that employers might want to alter certain holiday dates or times and provides them a method to do so.  Short of some more explicit language in the Rule itself, the Court refuses to strike down the Rule on the basis that an employer might independently violate the NLRA at some point in the future.  Consequently, the Rule does not run afoul of *Garmon* on this ground either.

### B.    *Machinists* Preemption

Initially, *Machinists* preemption "sought 'to determine whether certain weapons of bargaining neither protected by § 7 nor forbidden by § 8(b) could be subject to state regulation, [but] [i]t has been used more recently to determine the validity of state rules of general application that affect the right to bargain or to self-organization.'"  *520 S. Mich. Ave.,* 549 F.3d at 1126 (alteration in original) (quoting *Metro. Life,* 471 U.S. at 749 n.27).  Yet "the mere fact that a state statute pertains to matters over which the parties are free to bargain cannot support a claim of pre-emption, for there is nothing in the NLRA . . . which expressly forecloses all state regulatory powers with respect to those issues that may be the subject of collective bargaining."  *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 21–22 (1987).  To the contrary, "[t]he NLRA is concerned primarily with establishing an equitable process for determining terms and conditions of employment," *Metro. Life*, 471 U.S.

at 753, and a "state law is not preempted by the NLRA merely because it regulates a mandatory subject of bargaining." *520 S. Mich. Ave.*, 549 F.3d at 1128 (citing *Fort Halifax*, 482 U.S. at 21; *Metro. Life*, 471 U.S. at 757). Thus, a state law is not invalid just because it "gives employees something for which they otherwise might have to bargain." *Fort Halifax*, 482 U.S. at 21. Instead, a state law is preempted only when it "interfere[s] with collective bargaining." *520 S. Mich. Ave.*, 549 F.3d at 1129; *see also Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge*, 403 U.S. 274, 289 (1971) (courts "cannot declare pre-empted all local regulation that touches or concerns in any way the complex interrelationships between employees, employers, and unions; obviously, much of this is left to the States").

*Metropolitan Life* and *Fort Halifax* ultimately stand for the proposition that a state law that "establishes a minimum labor standard that does not intrude upon the collective-bargaining process" is not preempted by *Machinists*. *Fort Halifax*, 482 U.S. at 7; *see Am. Hotel & Lodging Ass'n v. City of Los Angeles*, 834 F.3d 958, 964 (9th Cir. 2016) ("As *Metropolitan Life* and *Fort Halifax* clarify, state action that intrudes on the mechanics of collective bargaining is preempted, but state action that sets the stage for such bargaining is not."). But the contours of a permissible "minimum labor standard" are ill-defined. The Supreme Court has only provided one working definition: "regulations that mandate benefits that 'affect union and nonunion employees equally,' 'neither encourage nor discourage the collective-bargaining processes,' and 'have [only] the most indirect effect on the right of self-organization.'" *Rest. L. Ctr. v. City of New York*, 90 F.4th 101, 113 (2d Cir. 2024) (quoting *Metro. Life*, 471 U.S. at 755). Nevertheless, it is beyond debate that

31

certain laws, such as "[c]hild labor laws, minimum and other wage laws, laws affecting occupational health and safety . . . laws requiring that employers contribute to unemployment and workmen's compensation funds, laws prescribing mandatory state holidays, and those dictating payment to employees for time spent at the polls or on jury duty," are minimum labor standards that implicate a State's traditional police powers and not the bargaining process. *Metro. Life Ins.*, 471 U.S. at 756.

Plaintiffs argue that the Rule is not a minimum labor standard because it "improperly shifts the carefully crafted" bargaining process of the NLRA, ECF No. 39 at 28, and is "'more properly characterized as an example of an interest group deal in public interest clothing'" than a minimum labor standard. ECF No. 47 at 7 (quoting *Chamber of Com. v. Bragdon*, 64 F.3d 497, 503 (9th Cir. 1995)). The Commissioner, on the other hand, argues that the Rule is "indistinguishable" from the permissible labor standards in *Metropolitan Life*, *Fort Halifax*, and their progeny. ECF No. 33 at 16–19. The Commissioner has the better argument.

Plaintiffs point the Court to no state regulation quite like that here, in which a State has mandated specific days on which employers are to pay holiday pay, but then allowed those employers the ability to shift some of the days if their employees agree. And the Court has been unable to independently identify a similar regulation. This, of course, means that there is no caselaw directly on point. The Court must then turn to comparative precedent. In *Metropolitan Life*, for example, the Supreme Court considered a state law requiring that "any general health-insurance policy that provides hospital and surgical coverage" must provide "a certain minimum of mental-health protection." 471 U.S. at 730.

The Supreme Court found no preemption, because although "like many laws affecting terms of employment, [it] potentially limits an employee's right to choose one thing by requiring that he be provided with something else, it does not limit the rights of self-organization or collective bargaining protected by the NLRA." *Id.* at 758.

Likewise, in *Fort Halifax*, the Supreme Court considered a state law requiring employers to provide severance pay to an employee if the employer laid off 100 or more employees or relocated more than 100 miles away, so long as the employee had worked at least three years, but the state law did not require severance pay if an employee's contract already addressed severance pay. *Fort Halifax*, 482 U.S. at 5. Employers argued that the law undercut the bargaining process because severance pay was something historically subject to bargaining. *Id.* at 20. The Supreme Court disagreed, explaining that "the NLRA is concerned with ensuring an equitable bargaining process, not with the substantive terms that may emerge from such bargaining," *id.*, and that although the "statute gives employees something for which they otherwise might have to bargain," that is true of "any state law that substantively regulates employment conditions," *id.* at 21. In every case, "employers and employees come to the bargaining table with rights under state law that form a 'backdrop' for their negotiations." *Id.* Thus, "the mere fact that a state statute pertains to matters over which the parties are free to bargain cannot support a claim of pre-emption." *Id.* The Supreme Court therefore has blessed as a minimum labor standard a state law requiring severance pay and one requiring that general health-insurance policies cover mental health.

More closely related to this case are decisions out of the Second and Ninth Circuits: *Restaurant Law Center*, *Associated Builders & Contractors of S. California, Inc. v. Nunn*, 356 F.3d 979, 983 (9th Cir. 2004), and *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77 (2d Cir. 2015). In *Restaurant Law Center*, the Second Circuit considered a city ordinance that "protect[ed] employees of large fast-food chains in New York City from arbitrary terminations and reductions in hours" and "provide[d] those fast-food employees with the option to arbitrate claims of alleged violations." 90 F.4th at 105. Employers argued that the law was "too detailed, too specific, too novel, and too intrusive on labor-management relations to constitute a *minimum* labor standard." *Id.* at 113. For instance, they asserted that the law provided "too many protections" to employees and in so doing mimicked a collective bargaining agreement. *Id.* But the Second Circuit explained that "'any state law that substantively regulates employment conditions' could be said to 'give [] employees something for which they otherwise might have to bargain,'" and that the mere fact that "'a state statute pertains to matters over which the parties are free to bargain cannot support a claim to pre-emption.'" *Id.* at 113–14 (alteration in original) (quoting *Fort Halifax*, 482 U.S. at 21–22). The employers also asserted that the law was too specific in that it only applied to "fast-food employers with thirty or more locations nationwide." *Id.* at 114. But the court explained that "the fact that a statute targets a particular subset of an industry does not, on its own, mean that the statute does not set a minimum labor standard." *Id.* The City was entitled "to craft targeted legislation establishing minimum labor standards in that particular industry." *Id.* In totality, the Second Circuit held that the law was a valid minimum labor standard because:

34

> It does not regulate the process of collective bargaining. Instead, the Law provides minimum protections to individual workers. These protections include safeguards against arbitrary terminations and reductions in hours absent misconduct or a bona fide economic reason, and protection for redressing employer violations through arbitration. All employees of covered entities in New York City benefit from these protections, whether they are unionized or not. And all covered employers must adhere to the Law's requirements, whether they employ unionized workers or not.

*Id.* at 1105.

In *Associated Builders*, the Ninth Circuit considered a statute that established "the rates that contractors are to pay to registered apprentices on private construction projects." 356 F.3d at 983. There, employers were required to either "pay registered apprentices a state-defined percentage of the prevailing per diem compensation package for journeymen in the relevant craft and geographical area" or "provide the same compensation package to registered apprentices on private projects that it pays for public work jobs in the same craft and locality." *Id.* If an employer did not employ a registered apprentice, it had no duty to pay its workers any particular amount. *Id.* The Ninth Circuit held that the law was not preempted because it did "not encourage or discourage registered apprentices from exercising their NLRA-protected rights to organize and bargain collectively because it does not preclude efforts to negotiate or exert economic leverage to set a level of compensation above its minimum standards." *Id.* at 989. And the Court held that although the statute targeted particular workers in a particular industry, "the NLRA does not authorize us to pre-empt minimum labor standards simply because they are applicable only to particular workers in a particular industry," and that "state substantive labor standards, including

minimum wages, are not invalid simply because they apply to particular trades, professions, or job classifications rather than to the entire labor market." *Id.* at 990.

Finally, in *Concerned Home Care Providers*, the Second Circuit considered a state law that "set[] the minimum amount of total compensation that employers must pay home care aides in order to receive Medicaid reimbursements" in New York City and its surrounding counties. 783 F.3d at 80. That court found the statute was "an unexceptional exercise" of a state's traditional authority to "remedy the problem of depressed wages by regulating payment rates." *Id.* at 85. In so finding, it rejected the idea that the law was impermissibly targeted to a specific profession in counties around New York City, noting that "*Machinists* preemption does not . . . eliminate state authority to craft minimum labor standards for particular regions or areas of the labor market." *Id.* at 86.

Then there are a handful of cases that *did* find a law preempted by *Machinists*, such as *Chamber of Commerce v. Bragdon*, *520 South Michigan Avenue*, and *Thunderbird Mining.* Plaintiffs rely heavily on these cases. But the facts and the holdings are readily distinguishable. For instance, in *Chamber of Commerce v. Bragdon*, the Ninth Circuit considered a law that set prevailing wages for specific private construction projects using formulas that averaged "wages and benefits for each craft pursuant to collective-bargaining agreements applicable in each labor market," and also dictated "the division of the total package that is paid in hourly wages directly to the worker and the amount paid by the employer in health, pension, and welfare benefits for the worker." 64 F.3d at 502. "In other words, it tied wages dynamically to ongoing and future bargaining processes." *Rest. L. Ctr.*, 90 F.4th at 115. The Ninth Circuit found the law preempted because it "sets detailed

36

minimum wage and benefit packages, distinct for each craft involved in certain limited construction projects," and "varies from time-to-time as new averages are calculated." *Bragdon*, 64 F.3d at 503. In doing so, it "effectively forc[ed] nonunion employers to pay what amounted to a union wage." *Am. Hotel & Lodging Ass'n*, 834 F.3d at 965 n.5 (cabining *Bragdon* to its facts); *see also Nunn*, 356 F.3d 979 at 990 (noting that *Bragdon*'s result was demanded by the fact that the law was "so restrictive as to virtually dictate the results" of collective bargaining).

Similarly, in *520 South Michigan Avenue*, the Seventh Circuit considered a state statute that set minimum break and rest standards for "one occupation (room attendants), in one industry (the hotel industry), in one county (Cook County, [Illinois])." 549 F.3d at 1130. Notably, the State enacted the statute in the middle of a bargaining dispute between those very attendants and their hotel employers. *Id.* at 1121. And the statute did more than just require breaks for those employees. It also created a presumption of retaliation if adverse employment consequences followed an employee's decision to take such breaks and shifted the burden of proof to the employer to show otherwise. *Id.* at 1135. Alongside this burden shifting, the statute authorized the recovery of attorney's fees and treble damages. *Id.* All in, the Seventh Circuit found that "[t]hese statutory provisions can in no sense be considered minimal," that the statute provided provisions that "would be very difficult for any union to bargain for," and that the State "effectively substitute[d] itself as the bargaining representative" for the attendants. *Id.* at 1134–36. The timing of the statute's implementation during an ongoing labor dispute and its intrusive scope in

which the burden of proof was shifted make this case readily distinguishable from the Rule here.

Finally, in *Thunderbird Mining*, the district court considered a Minnesota statute that dealt with the release of funds to Iron Range producers. 138 F. Supp. 2d at 1194–95. By statute, the Minnesota Iron Range Resources and Rehabilitation Board ("IRRRB") "collect[ed] taxes on taconite and iron sulphides produced in the region" and then distributed those taxes to various funds. *Id.* at 1195. One of the funds, the Taconite Economic Development Fund (TEDF), was tentatively allocated to Iron Range producers for "major capital improvements, including the acquisition of equipment and facilities." *Id.* at 1198–99. However, by statute, the TEDF funds could not be distributed "to a producer for a proposed project unless the IRRRB receives authorization from the company's joint committee of labor and management," which was made up of employees selected by the local union director or, in non-union shops, by worker election. *Id.* at 1195. If a producer applied for funds but those funds were not released within two years, the funds would be given away to environmental groups. *Id.* The court found the law preempted because it gave a powerful bargaining chip to the employees: by conditioning the release of funds on employee approval, the employees could threaten (and indeed had threatened) to withhold funds in exchange for unrelated employment benefits. *Id.* at 1199 ("As an example, assume a machine can be purchased which performs the work of three or four union workers; it is unlikely in the extreme such a device could be acquired using TEDF funds absent a compensating management concession."). And, "[b]y giving the

Union a thumb to put on the economic scale, the State has improperly distorted that process." *Id.*

Against this backdrop, the Rule is more akin to a minimum labor standard than an impermissible overreach into the bargaining process. The Rule applies to union and non-union employees equally. It establishes a requirement of time-and-a-half pay on eleven holidays. And it applies generally to every nursing-home worker across the entire state in rural, suburban, and urban areas. It is true that the Rule also allows employers to alter up to four of the eleven designated holidays upon receiving majority approval, but the Court has already noted that this is not akin to "bargaining." Nor does the Rule pressure "employers to enter collective-bargaining agreements or encourage unionization, as it merely provides protections to employees that otherwise could have been addressed through collective bargaining." *Rest. L. Ctr.*, 90 F.4th at 116.

Plaintiffs contend that the Rule is not a true minimum labor standard and that it is more akin to those in *Bragdon*, *520 South Michigan Avenue*, and *Thunderbird Mining.* First, they argue that the Rule is like that in *520 South Michigan Avenue* because it applies to "one occupation, in one industry." ECF No. 39 at 29. But this is factually incorrect: the Rule does not apply to "one occupation." Indeed, as Plaintiffs acknowledged at oral argument, the Rule applies to all who qualify as a "nursing home worker," which covers a wide range of employee professions so long as those employees work within a nursing home.[9] In *520 South Michigan Avenue*, by contrast, the statute applied to only one specific

---

[9] A nursing home worker is "any worker who provides services in a nursing home in

position in a single county, and was enacted in the middle of an ongoing labor dispute. 549 F.3d at 1121, 1130. Plaintiffs' related argument that the Rule is like *Bragdon* and *520 South Michigan Avenue* because it applies only "to one subset of workers who perform work in a specific area of most long-term care campuses," ECF No. 47 at 6, is legally irrelevant. As the Second Circuit explained, "the fact that a statute targets a particular subset of an industry does not, on its own, mean that the statute does not set a minimum labor standard." *Rest. L. Ctr.*, 90 F.4th at 115; *see also Concerned Home*, 783 F.3d at 86 ("*Machinists* preemption does not eliminate state authority to craft minimum labor standards for particular regions or areas of the labor market."); *Am. Hotel & Lodging Ass'n*, 834 F.3d at 961 (ordinance passed by the city of Los Angeles that created a minimum wage only for hotel workers at hotels with more than 150 employees not preempted by *Machinists*). Those cases dealt more narrowly with fast-food workers at large franchises in New York City and home health care workers in and around New York City and the rules were nevertheless valid. Here, the Rule applies to a broad range of nursing home workers— janitors, dieticians, registered nurses, cooks, and more—across all of Minnesota.

Plaintiffs further assert that the Rule micromanages the employer-employee relationship because it provides "specifically when the holiday pay wage must be paid and

---

Minnesota, including direct care staff, non-direct care staff, and contractors, but excluding administrative staff, medical directors, nursing directors, physicians, and individuals employed by a supplemental nursing services agency." Minn. Stat. § 181.211, subd. 9. This would cover, as the Board explained in its December 10, 2024 memo, "non-management registered nurses, certified nursing assistants, trained medication aides, dietary aides, cooks and more," including, as Plaintiffs acknowledged during argument, cleaning services and environmental services workers.

how the employer and the union can negotiate changes in the hours of the holiday and change up to four holiday dates." ECF No. 39 at 29. As to mandating "when the holiday wage must be paid," the Court fails to see how this intrudes on the bargaining process any more than the law addressed in *Fort Halifax*, which required employers to provide severance pay to an employee only if the employer laid off 100 or more employees, or relocated them more than 100 miles away, so long as the employee had worked for the employer for at least three years. *Fort Halifax*, 482 U.S. at 5. That law's specificity as to when a benefit must be paid is far more detailed than the Rule's designation of eleven holidays. As to the Date Flexibility provision, the Rule simply requires an employer to receive majority approval from employees. The Court again rejects Plaintiffs' characterization of the Rule as establishing any sort of bargaining process itself.

Third, Plaintiffs take issue with the private right of action given to nursing home workers to remedy violations of the Rule, analogizing to *520 South Michigan Avenue*. ECF No. 39 at 30. Plaintiffs argue that the right of action is too favorable because it also authorizes class actions and allows an employee to seek lost wages and reasonable costs, disbursements, witness fees, and attorney's fees. *Id.*

Notably, the complained of private right of action is not included in the Rule itself, but in Minn. Stat. § 181.217, subd. 3. That section, in turn, provides that "[o]ne or more nursing home workers may bring a civil action in district court seeking redress for violations of sections 181.211 to 181.217 or of any applicable minimum nursing home employment standards or local minimum nursing home employment standards." *Id.* The

41

right of action is therefore widely applicable and can be used by nursing home workers to remedy any number of potentially unrelated violations.

That said, it is true that in *520 South Michigan Avenue*, the court observed that a private right of action "encourage[ed] litigation rather than resolution," which supported its view that the law at issue was preempted. 549 F.3d at 1137. But the Seventh Circuit's concern with that private right of action was primarily its coupling with a provision "shifting the burden of proof to the employer" to prove that the employer *did not* violate the new regulation. 549 F.3d at 1135. It was the extraordinary nature of that specific private right of action, created within an extraordinarily specific statute, which prompted the Seventh Circuit's conclusion of *Machinist* preemption. Of course, private rights of action similar to that present here are available to workers to remedy nearly *every* type of wage dispute. *See, e.g.*, Minn. Stat. § 177.27, subd. 8. ("An employee may bring a civil action seeking redress for a violation or violations of sections 177.21 to 177.44 and 181.165 directly to district court."). And a private right of action was also present in *Restaurant Law Center*, where the statute allowed employees three enforcement mechanisms: they could (1) "either file an administrative complaint with the New York City Department of Consumer and Worker Protection," (2) "bring a private action in court," or (3) "initiate an arbitration proceeding." 90 F.4th at 108 (citations omitted). It further provided that "[a]n employee who prevails at arbitration is entitled to attorneys' fees and costs, reinstatement or restoration of hours, and all other appropriate equitable relief," including "such other compensatory damages or injunctive relief as may be appropriate." *Id.* (citations omitted).

The Court, in short, finds nothing out of the ordinary with the private cause of action available here.

Finally, Plaintiffs argue that the Rule "'is more properly characterized as an example of an interest group deal in public-interest clothing,'" ECF No. 39 at 32 (quoting *Bragdon*, 64 F.3d at 503), and "has the impact of reducing the incentive for parties to engage in collective bargaining and, instead, 'redirect efforts of employees not to bargain with employers, but instead, to seek to set minimum wage and benefit packages with political bodies,'" *id.* at 31–32 (quoting *Bragdon*, 64 F.3d at 504). But this concern is, again, misplaced. *Machinists* is concerned only with ensuring that the collective bargaining process itself is fair. It "is not a license for courts to close political routes to workplace protections simply because those protections may also be the subject of collective bargaining." *Rest. L. Ctr.*, 90 F.4th at 116 (citation omitted). Indeed, that a statute might "give[] employees something for which they otherwise might have to bargain," is true of "any state law that substantively regulates employment conditions." *Fort Halifax*, 482 U.S. at 21. In every case, "employers and employees come to the bargaining table with rights under state law that form a 'backdrop' for their negotiations." *Id.* Thus, "the mere fact that a state statute pertains to matters over which the parties are free to bargain cannot support a claim to pre-emption." *Id.* Even the Ninth Circuit has stepped away from *Bragdon*'s premise, explaining that "[i]t is now clear in this Circuit that state substantive labor standards, including minimum wages, are not invalid simply because they apply to particular trades, professions, or job classifications rather than to the entire labor market." *Nunn*, 356 F.3d at 990.

In short, a thorough review of the limited case law in this area convinces the Court that the Rule does nothing more than create a new minimum labor standard in requiring nursing home employers to pay time and a half on eleven specific days. It provides benefits that "affect union and nonunion employees equally," does not "encourage nor discourage the collective-bargaining processes" otherwise available to employers and employees and has no impact on the "right of self-organization." *Metro. Life*, 471 U.S. at 755. The heavy-handed regulations in *Bragdon*, *520 South Michigan Avenue*, and *Thunderbird Mining*, which were found to overstep into the bargaining process itself, are easily distinguishable. Accordingly, *Machinists* preemption does not apply to the Rule.

### CONCLUSION

Because the Rule does not, as a matter of law, require or sanction employers to violate the NLRA, and does not otherwise regulate conduct that the NLRA intended be unregulated, Plaintiffs fail to allege a cognizable legal theory that the Rule is subject to *Garmon* or *Machinists* preemption. Accordingly, the Court dismisses Plaintiffs' claim that the Rule is preempted by the NLRA. Because the Plaintiffs voluntarily dismissed their only other claim—that the Rule is unconstitutionally vague—the Court will therefore dismiss Plaintiffs' amended complaint in its entirety. And because the Court dismisses the amended complaint in its entirety, the Court denies Plaintiffs' request for a preliminary injunction as moot.

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    The Commissioner's Motion to Dismiss the Amended Complaint (ECF No. 36) is **GRANTED**;

2.    Plaintiffs' Motion for a Preliminary Injunction (ECF No. 26) is **DENIED AS MOOT**; and

3.    The Amended Complaint (ECF No. 22) is **DISMISSED WITHOUT PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: May 23, 2025                          _s/Laura M. Provinzino_
                                             Laura M. Provinzino
                                             United States District Judge